THE THAMES BANK *against* LOVELL and another :

IN ERROR.

An act of a state legislature imposing reasonable tolls, as compensation for improving the navigation of a river within its own borders, is constitutional and valid, unless it conflicts with the powers of Congress in actual exercise.

The establishment, by an act of Congress, of a port of delivery on a river, is not an exercise of the power of Congress to regulate commerce, which conflicts with an act of a state legislature, imposing tolls on vessels passing to and from such port, as a compensation for improving the navigation of such river.

An act of a state legislature imposing tolls for such a purpose, is not an attempt, on the part of such legislature, to regulate commerce.

Nor is commerce, in such case, *crippled,* by the tolls; but the legislation of the state comes *in aid* of the powers of Congress.

Nor are the tolls so imposed in the nature of a tonnage duty, or any duty at all upon the vessel, within the meaning of the constitution.

After the legislature of this state had incorporated a company for the purpose of clearing and deepening the channel of the river *Thames,* and had granted to such company certain tolls on vessels passing up and down such river; and the company had complied with the conditions of their grant; further sums

were appropriated and expended, by authority of the state and national legislatures, in making additional improvements in the navigation of the same river, by means of which it admitted of the passage of vessels of greater draught of water than could pass before. Held, that the company so incorporated, or their successors, were not the less entitled to the tolls specified in their grant, by reason of the latter expenditures and improvements.

*New-London,*
July, 1847.

Thames Bank
*v.*
Lovell.

THIS was an action of debt, brought before a justice of the peace, to recover of the defendants the sum of five dollars, fifty cents, for the passing of a schooner, called the *Banner,* owned by them, from the port of *New-London* to the port of *Norwich,* through the channel of the river *Thames,* drawing eight feet and eight inches of water.

The declaration set forth the act of the General Assembly, passed in *May,* 1805, incorporating *The Norwich Channel Company,* for the purpose of deepening and improving the channel of the river *Thames,* and facilitating the navigation thereof. (*a*) It then averred, that by said act, and by other acts or resolutions of the General Assembly in addition to and alteration of the same, passed in the years 1816, 1821 and 1822, said company were fully authorized and empowered, whenever they should have deepened the channel of said river, and removed the obstructions to the navigation thereof, so that vessels drawing seven and a half feet of water, might pass through said channel, at high water, in ordinary times, it should be lawful for said company, and they were fully authorized and empowered, to demand and receive from every vessel passing up or down in said channel, and drawing six feet of water, a toll of one dollar, for every time such vessel should pass up or down said channel; and for vessels drawing seven and a half feet of water, said company were, in like manner, authorized to demand and receive four dollars, and also fifty cents per inch in addition, for every inch over seven and a half feet, to ten feet; that by said resolutions of the General Assembly, it was further provided, that said tolls should be payable, by the master, commander, or owner of such vessel or vessels, passing said channel as aforesaid, at such place and to such persons, as the president and directors of such company should appoint to receive the same; and in case of the arrival of such vessel at *Norwich,* after passing

(*a*) See *Priv. Stat.* 512. & seq.

through said channel, the toll due from said vessel was requir-ed to be paid within twenty-four hours next after the time of said arrival; and in case of the departure of such vessel from *Norwich*, to pass down the river, through such channel, the toll payable from such vessel was required to be paid before such departure, on pain of forfeiting, to and for the use of said company, three times the amount of toll which would be pay-able from such vessel, at the rates aforesaid ; the amount spe-cified being recoverable, by action against the master, com-mander or owner of such vessel.

It was then averred, that prior to the session of the Gener-al Assembly in *May*, 1825, said company, pursuant to the re-quirements of their charter, had deepened the channel of said river, and had removed the obstructions from the same, so that vessels drawing seven and a half feet of water, might pass through said channel, at high water, at ordinary times; that said company, for the purposes aforesaid, had expended, un-der said grants to them, large sums of money, and had com-plied with all the requirements of the General Assembly in said resolutions, so that they were fully entitled to have and collect tolls as aforesaid, for vessels passing through said channel, and were in the full and uninterrupted exercise and enjoyment of the rights, privileges and franchises so granted to them, by their charter and said resolutions in addition to and alteration of the same.

The declaration then proceeded to state, that at the session of the General Assembly held in *May*, 1825, the plaintiffs were duly incorporated and constituted a body corporate, by the name of *The President, Directors and Company of the Thames Bank*, with banking powers and privileges ; that by their charter of incorporation, the directors were required, immediately after said corporation should have become or-ganized under their charter, to purchase and cause to be transferred to said bank, the stock of all such members of the *Norwich Channel Company* as should sell or transfer their shares therein to said bank, at the rate of twenty dollars per share ; that by the charter of said bank, it was further provi-ded, that when all the shares of the *Norwich Channel Compa-ny* should have been transferred to said bank, then said chan-nel company should cease to exist, and the plaintiffs in this suit, so incorporated, should immediately succeed to all the

estate of said company, of every name and nature, and to all the powers, privileges, rights, immunities and franchises of said company, which should thereafter accrue and belong to, and might be used and exercised by, said *Thames Bank*, in the same manner, and to as full extent, as though particularly specified in said act of incorporation ; but that it was further provided, that said bank should thereafter be entitled to receive only at the rate of fifty *per cent.* of the tolls then established, by the act incorporating said channel company, and the several resolutions of the General Assembly, in addition thereto and in alteration thereof; that the plaintiffs, by their said act of incorporation, are required within two years from the first organization of said bank, to cause to be expended, the sum of 3000 dollars, and the tolls collected during said two years, in deepening the channel and improving the navigation of said river ; and each and every year, after the expiration of said two years, to cause to be expended, for the purposes aforesaid, the sum of 500 dollars, or such part thereof as should be necessary, to give a channel of the depth of ten feet of water, at common and ordinary tides ; that by said act of incorporation of said bank, it was further provided, that all the power and duties, which belonged to the president and directors of said channel company, should, forever thereafter, appertain to and be exercised by, the president and directors of said bank.

The declaration further stated, that in the year 1825, said bank was duly organized under its charter, and immediately thereupon the directors of said bank did purchase, and cause to be transferred to said bank, all the shares of stock in said channel company ; and thereupon, *viz.* on the 1st day of *May*, 1826, the plaintiffs became, and have ever since continued to be, fully entitled to all the right, privileges, franchises, immunities and powers, before that time belonging to said *Norwich Channel Company*, in the manner before set forth ; that since the transfer of said shares of stock as aforesaid, the plaintiffs have done and performed all things, which by said acts of incorporation are required of them, in succeeding to the rights and duties of said channel company ; and that they are now, and for twenty years last past have been, fully entitled to collect, receive and have said tolls, in the same man-

ner as said channel company were entitled to do, under said grant made to them.

The declaration then averred, that on the 1st day of *March*, 1846, the defendants were, and at all times since have been, the owners of a certain schooner, called the *Banner ;* and on the 20th day of said *March*, said vessel, under the command and controul of said *Lovell*, [one of the defendants,] as the master and commander of the same, was navigated and sailed up said river, from the port of *New-London* to the port of *Norwich ;* and on the same day, arrived at said port of *Norwich*, passing through said channel, which had been, by said channel company, and by the plaintiffs, as their successors, so as aforesaid deepened and kept open for the purposes of navigation, so far as they were, by their charter, and said resolutions of the General Assembly, required to do ; that at the time when said vessel passed through said channel as aforesaid, said vessel drew more than six feet of water, *viz.* eight feet and eight inches of water, and was then subject as aforesaid to a toll of five dollars and fifty cents, for so passing through said channel, for the use of the plaintiffs ; that the defendants, by reason of the premises, became liable to the plaintiffs to pay said last mentioned sum of money for their use, within twenty-four hours next after the arrival of said vessel at said port of *Norwich ;* that though the defendants, after such arrival, were required to pay for the use of the plaintiffs, the toll payable by the defendants as aforesaid, yet the defendants would not then pay, nor have they ever paid, said toll, so due and payable, but the same still remains wholly due and unpaid.

To this declaration the defendants pleaded in bar, that the river *Thames* is, and ever has been, a navigable river, in which the tide ebbs and flows from two to four feet, from the sea to the city of *Norwich*, in the district of *New-London*, and is navigable for vessels of at least      tons burthen ; that the harbour of *Norwich*, on said river, is, and has been, for more than fifteen years, and during all the time that said vessel, called the *Banner*, has navigated said river, a port of delivery, duly created as such, by the laws of the *United States ;* that since said resolutions of the General Assembly incorporating said *Thames Bank*, and transferring to said bank the rights of said channel company, *viz.* at the session of the General Assembly

New-London,
July, 1847.

Thames Bank
v.
Lovell.

in *May*, 1833, the General Assembly incorporated the *Merchant's Bank* at *Norwich*, with the usual banking privileges, imposing on that corporation the duty of expending a sum not exceeding 30,000 dollars, in clearing and deepening the channel of said river *Thames*, within five years after said act of incorporation was passed, should so much be necessary ; that said corporation did, within five years as aforesaid, lay out and expend, in clearing and deepening the channel of said river, the sum of 15,000 dollars, according to the requirements of said act ; that since the incorporation of said *Thames Bank*, *viz.* on the 4th day of *July*, 1836, by an act of Congress of the *United States* of that date, entitled " An Act for the improvement of certain harbours therein named," the sum of 10,000 dollars was appropriated for deepening the channel of said river *Thames*, leading into said *Norwich* harbour ; that by subsequent acts of the Congress of the *United States*, the sum of 30,000 dollars additional to the aforesaid sums, was appropriated, for the like purpose of improving and deepening the channel of said river *Thames*, leading into said *Norwich* harbour ; that the whole sums aforesaid, amounting in all to the sum of 55,000 dollars, have been expended in improving and deepening the channel of said river, leading into said harbour, since the passage of the act incorporating said *Thames Bank* with the rights and privileges aforesaid, and before the commencement of this suit ; that the expenditure of said sum of 55,000 dollars, has greatly improved the channel of said river, and deepened the water therein, *viz.* from eight feet, the greatest depth of water at ordinary tides, prior to said expenditure, to more than ten feet, the present depth at ordinary tides ; that during all the time aforesaid, while said vessel called the *Banner* was passing up and down said river *Thames*, she was duly licensed as a coasting vessel, in all respects according to the laws of the *United States ;* that said vessel is and was of      tons burthen, and upwards, and was passing from and to other ports in the *United States*, to and from said port of *Norwich*, for the purpose of delivering her cargoes of freight and merchandize : all of which the defendants are willing to verify.

To this plea there was a demurrer, followed by a joinder in demurrer.

The court adjudged the plea of the defendants sufficient,

and rendered final judgment in their favour.   The plaintiffs thereupon brought a writ of error in the superior court ; which was reserved for the advice of this court.

*Strong*, for the plaintiffs in error, contended, 1. That the grant of tolls to the *Norwich Channel Company*, and to the *Thames Bank*, their successors, was a valid grant, and not repugnant to the constitution of the *United States*.   In support of this position, he relied upon the case of *Kellogg* v. *The Union Company*, 12 *Conn. R.* 7. as decisive.   This was the great point in the case ; it was argued elaborately, by able counsel ; it was fully considered by the court ; and was decided without a dissenting voice.   Such a decision, made but ten years since, will be regarded, by *this court*, as a binding authority.

But if this could be regarded here as an *open* question, it ought now, upon principle and the authority of other adjudications of the highest respectability, to be determined in the same way.   In the first place, the river *Thames* is a navigable river, lying wholly within this state ; and the General Assembly had originally the entire controul of its navigable waters. Secondly, this controul, since the adoption of the federal constitution giving to Congress the exclusive power to regulate commerce with foreign nations, and between the states, remains the same as before, except so far as it has been affected by the actual legislation of Congress on the subject.   Thirdly, the establishment, by the authority of Congress, of a port of delivery on this river, does not take from the state the power of improving its navigation.   Fourthly, Congress has, in no other manner, attempted to regulate the commerce of this river, or done any act interfering with the franchise of the plaintiffs ; but, on the contrary, has made grants in aid of the same specific object, *viz.* the clearing and deepening of the channel.   There is no conflict between any act of Congress regarding the commerce of this river, and the grants to the *Norwich Channel Company*, and their successors, the plaintiffs.   So far from this, they all harmonize ; they all have the same general, and most of them the same specific, object in view.   In the late case of the *United States* v. *The Proprietors of New-Bedford Bridge*, 10 *Law Reporter*, 128. one of the points decided is, that the grant of power to Congress,

without any prohibition on the states, express or strongly im-
plied, does not prevent the states from continuing to act on

subjects within the grant, until Congress legislate *fully* on those subjects, and so as to *conflict* with the doings of the state. This is also the doctrine of the earlier cases. See the cases cited by *Bissell*, J , in giving the opinion of the court in *Kellogg* v. *The Union Company*, 12 *Conn. R.* 20 to 27.

2. That the subsequent appropriations, by authority of the General Assembly of this state, and of Congress, to improve the navigation of the river *Thames*, cannot deprive the plaintiffs of the tolls granted to them as a remuneration for their disbursements.

*Staples* and *Foster*, for the defendants, (*a*) contended, 1.

(*a*) The senior counsel, who was a native of an adjoining county, and had been, from his youth, acquainted with the elder members of the *New London* county bar, introduced his argument in this case, with the following remarks, delivered in a low tone of voice, with deep but subdued emotion : " This cause and my connection with it, have brought to my mind many painful recollections. Where are those who so lately presided over that bright city, where this cause originated, and who so often instructed and delighted this court and bar, by their intellect and by their eloquence, and who doubtless would have been concerned in this cause, had they remained among the living ! But alas ! they have been gathered to the mighty congregation of the dead. Nothing short of the last great trump can ever again reach their cold, deaf ear. Nothing but the power of the resurrection can ever again move their tongues for weal or woe ; for they are mouldering in the dust.

In this city, in this hall of justice, where are those who so lately graced its seats—so lately honoured this bar ! My friend and relative, who so long presided over this city,—who was so hospitable, so kind and so gentlemanly, in all his deportment—where is he !

Another friend, and my towns-man, a profound counsellor, who always enlightened the court from his rich stores of learning, and who was alike the friend and ornament of this bar—where is he ! And let me add, where is that son of his, so bright, and who promised so much, and who was struck down just as he was entering upon a splendid career of professional honours !

And where is my class-mate, and once my friend, whose professional and military career was alike honourable to this city and this bar !

And though last, not least, where are the two friends, whose desolate mansions I passed in coming up to this hall, whose learning and ingenuity, and whose scintillations of wit and pleasantry, delighted and instructed all within their reach ! Alas ! they have gone the way of all the earth ; and we must soon follow.

Has there been a tempest, which has swept away or put out these bright lights ? Yes, there has indeed been a tempest ; but it did not strike this city. It drove upon the rocks not far distant, one of our floating palaces, and dashed it into a thousand pieces, and buried in a watery grave many a loved one ; and

*New-London,*
*July, 1847.*

Thames Bank
*v.*
Lovell.

That the acts and resolves of the General Assembly of this state, purporting to authorize the plaintiffs to collect the tolls demanded in this action, are invalid, being repugnant to that clause of the constitution of the *United States,* which gives to Congress the power "to regulate commerce with other nations, and among the several states, and with the *Indian* tribes." *Art.* 1. *s.* 8. *cl.* 3.

In the first place, the power to regulate commerce, given to Congress, is entire—exclusive—a unit, as it has been called. *Gibbons* v. *Ogden,* 9 *Wheat.* 198. 200. 209. 11 *Peters,* 158. per *Story,* J. Secondly, this power to regulate commerce, is a power to regulate navigation. 9 *Wheat.* 189. Thirdly, those laws of the state which incidentally affect commerce, but do not aim to *regulate* commerce, do not belong to this head, and are not inconsistent with the exclusive power of Congress on this subject. Such are laws to preserve the health of the community, *viz.* quarantine laws, and laws to prohibit noxious or contagious goods from being introduced; to provide for the safety of the community, by imposing restrictions upon the storing, transportation and sale of gunpowder; to protect the morals of the community, by prohibiting the introduction and sale of obscene books and pictures, and other libellous publications; to guard against the introduction of paupers, felons and slaves. To the same class belong state laws providing for the inspection of flour, cornmeal, pork, beef, fish, lard, pot-ashes, pearl-ashes, shingles, &c. These laws regard the preparation of the article for commerce, and relate as much to agriculture as to commerce.

there its bell has scarcely stopped its moanings; and there it has but just closed its requiem for the dead. Has the pestilence been here, that walketh in darkness and wasteth at noon-day? Ah, no. It is that mortal foe, whose arrow delights to strike a shining object; who will soon declare 'Time was, but Time shall be no more,' that has been so busily at work.—Less I could not say—more I may not. This is not the time or place to dwell on these interesting events—these melancholy subjects."

[The personal allusions in these remarks were sufficiently intelligible to those who heard them; but for distant or future readers, an explanation may be needful. The following are the names of the persons referred to, in the order in which they occur, *viz. Goddard* and *Lanman* of *Norwich; E. Perkins, Cleaveland, sen., Cleaveland, jun., Isham, Law* and *Brainard,* of *New-London;* all of whom had died within a few years, in rapid succession. To these might have been added *Billings* and *T. S. Perkins,* of the same bar, who had died within the same period.]

2. That the acts of the General Assembly of this state, levy-
ing the duty or toll claimed by the plaintiffs, upon vessels nav-

igating the river *Thames*, are in conflict with the laws of the United States, constitutionally made. In the first place, the acts in question conflict with the laws of the *United States,* made for registering and licensing the coasting trade. By these laws, this vessel, the *Banner,* was authorized to take her cargo to the port of *Norwich*, and there deliver it. But the state laws declare, that if she goes there, she shall pay so much toll. Is not this regulating navigation ? Is not this the object of these laws ? Is not this an interference with the exclusive power of Congress ?

Secondly, these laws of the state imposing a duty or toll on vessels navigating the river *Thames*, are in direct conflict with the acts of Congress making appropriations for improving the channel of this river. By these acts, Congress has asserted its jurisdiction over the channel of this river. Here Congress has acted upon the same subject matter; and this distinguishes the present case from that of *Kellogg* v. *The Union Company*, 12 *Conn. R.* 7. But how can these two authorities act on this subject *concurrently ?* Will Congress be supposed to consent that the state should tax the vessels navigating the channel it has made ? Suppose Congress had made a new channel on the other side of the river; could the state impose tolls on vessels passing through it ?

3. That the acts of this state imposing the duty in question, are repugnant to the clause of the constitution of the *United States,* which prohibits the states from levying any tonnage duty. *Art.* 1. *s.* 10. 9 *Wheat.* 202.

CHURCH, Ch. J. The leading principle involved in this case, was also involved and decided, by this court, in the case of *Kellogg* v. *The Union Company*, 12 *Conn. R.* 7. and it is admitted, that the chief object here, is, to induce us to review the opinion expressed in that case, as well as to satisfy us, that there are material facts here, not found there, which ought to distinguish the present from the former case.

The case of *Kellogg* v. *The Union Company* was decided upon great deliberation, and in view of all the important cases bearing upon it, which had gone before it; and although, it

may be too much for us to say, that no doubts were then entertained or expressed, upon the controuling principles of the decision, yet they were not so great as to produce any dissenting opinion.

The doctrine of that case, as we now recognize it, is, that Congress, by the constitution of the *United States,* has the exclusive right to regulate commerce with foreign nations and among the several states; but that an act of a state legislature, imposing reasonable tolls, as a compensation for rendering navigable, or more extensively so, a river within its own borders, is constitutional, unless it conflicts with the actual exercise of the powers of Congress. The power to regulate commerce, says Chief Justice *Marshall,* in *Gibbons* v. *Ogden,* 9 *Wheat.* 1. "is to prescribe the rule by which commerce is to be governed." And in the same case, *Johnson,* J. says, that "it is no objection to the existence of distinct, substantive powers, that in their application, they bear upon the same subject."

Now, what has Congress done, and what has the state done? Congress has passed no law with particular reference to the navigation of the river *Thames;* nor directed upon what terms vessels might navigate this stream. It has made *Norwich* a port of delivery; and if it had not, it does not follow, that vessels duly licensed, would not have had the same right to pass and repass to and from that port.

The state has not attempted to regulate commerce upon this river: it has only, by virtue of its original powers, through the agency of a corporation, created by itself, rendered navigable, by a certain description of vessels, a river which was not navigable before, and has to all licensed vessels and others, extended facilities of commercial intercourse, beyond what existed before. This, it has done, by virtue of the same authority by which it constructs roads, bridges, ferries and canals. And laws establishing these latter, says *Johnson,* J., in the case referred to, (*p.* 235.) "are in fact commercial facilities, for which, by the consent of mankind, a compensation is paid, upon the same principle, that the whole commercial world submit to pay light money to the *Danes.*" These acts, improving rivers, constructing roads, &c. will never be complained of, as interfering with the rights and powers of

Congress. The tolls alone are the subject of complaint. But
these are only the fair equivalent for privileges, which the state had a right to create, and without which these privileges could never have existed. Commerce, therefore, has not been crippled, by the tolls, as the defendant claims, but has been extended by them. The legislature of the state creating this corporation, with its duties and its privileges, has come in aid of the powers of Congress.

It seems to be admitted, that states may construct canals, turnpikes, bridges, &c. and impose tolls upon passengers and freight, as a remuneration for the improvement ; and that this may be done, without interfering with the power of Congress to regulate commerce among the states, or its power to establish post-offices and post-roads. We have not been able to discover a sound distinction between these cases and the one we are considering. Congress has the same power to regulate commerce, upon the land as upon the water. A river, to be sure, is a natural channel ; but if it is not a navigable one, it can no more be used for the purposes of commerce, than the land ; and therefore, to convert it from a mere natural channel into a public highway, for commercial purposes, and to levy a toll to reimburse the expense, no more conflicts with the powers of Congress over the commerce of the country, than the construction of a canal or a turnpike for the same purposes, with the same tolls. And this, we think, is equally true of rivers, which are only navigable to a partial and limited extent, and by artificial and expensive means, are rendered navigable to a greater extent, with a reasonable toll levied upon those only, who receive the benefit of the extended navigation. The principle is the same, in both the cases stated.

In speaking here of navigable rivers, we speak of them as public highways only, without reference to the flow of the tides ; for to all rivers navigable in fact, the power of Congress to regulate commerce, may extend, without distinction. And we suppose, therefore, that the several state legislatures have the same power to improve the navigation of tide water rivers, as any other.

It is said, by *Woodbury,* J., in the late case of *The United States* v. *The Proprietors of the New-Bedford Bridge,* " That a grant of power by Congress, probably, does not prevent the states from continuing to act on subjects within the grant, till

Congress *legislate fully* concerning it, and so as to *conflict* with the doings of the state, unless there is an express prohibition on the states to act further in the matter, or it is strongly implied from the nature of the case." *Law Reporter, July,* 1847, *vol.* 10. *p.* 127. We think this is the safe doctrine, and tends more to harmonize the different jurisdictions of state and national legislation, than any other. Certainly, the mere existence of an unexercised power in Congress, should not prevent the necessary exercise of a similar or equivalent power by the states, if they originally possessed it. And in the present case, Congress has done nothing more than to constitute *Norwich* a port of delivery—an act which has become of more importance, by reason of the legislation of the state, authorizing and effecting the improvement of the navigation of the river. Here is no conflict.

But it is objected, that by the operation of this charter, a tonnage duty is in effect levied upon licensed vessels navigating the river. If this be so, it is illegal; for this power is taken away from the states, by the constitution of the *United States.* But we think that this toll is not in the nature of a tonnage duty, or any duty at all upon the vessel, within the meaning of the constitution, any more than a toll at a turnpike gate, is a duty upon the carriage : it is a compensation exacted for a privilege conferred, and in proportion to it. It is no more a tonnage duty, than laws regulating wharfage or port charges.

Upon this second consideration of the principles advanced by us, in the case of *Kellogg* v. *The Union Company,* we again assert them, and yield to the authority of that case as binding upon us.

Nor are we satisfied, that the additional facts peculiar to the present case, and relied upon by the defendant, as delivering it from the authority of the former case, are sufficient for that purpose. This record shows, that in addition to the improvements made in the navigation of the river, and to the money expended by the original *Norwich Channel Company,* and by the plaintiffs, the *Merchants' Bank,* under a resolve of the General Assembly, has expended fifteen thousand dollars, and also, that by virtue of an appropriation made by Congress, there has been expended a further sum of thirty thousand dollars ; and thereby the navigation has been still more and

essentially improved for the passage of vessels of greater
draught of water than before. But if the original charter,
and the authority to collect tolls under it, upon a compliance
with its conditions, was constitutional and valid; and if the
navigation has been improved, at the expense of the plaintiffs
and of those to whose rights they have succeeded, of which
the navigators of the river and these defendants, are receiving
the benefit; how can it be said, that the plaintiffs can be de-
prived of the stipulated reimbursement provided for their ex-
penditures, because other improvements from other means,
have been superadded to theirs? We know of no principle of
common justice, which can sanction such a course. These
latter improvements have been made in addition, and not,
either in opposition to, or in destruction of, such as were
effected by the plaintiffs.

We advise the superior court, that the judgment of the jus-
tice of the peace is erroneous; and that it be reversed.

In this opinion the other Judges concurred, except WAITE,
J., who declined giving any opinion, being a stockholder, or
related to some stockholder, of the *Thames Bank.*

Judgment reversed.