# HUSE *v.* GLOVER.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE NORTHERN DISTRICT OF ILLINOIS.

Argued December 10, 1886. — Decided December 20, 1886.

The provision in the ordinance of 1787 that the navigable waters leading into the Mississippi and the St. Lawrence shall be common highways, forever free, without tax, impost, or duty therefor, refers to rivers in their natural state, and does not prevent the State of Illinois from improving the navigation of such waters within its limits, or from charging and collecting reasonable tolls from vessels using the artificial improvements as a compensation for the use of those facilities.

*Escanaba Co.* v. *Chicago*, 107 U. S. 678, restated and affirmed, and applied to this case.

A river does not change its legal character as a highway if crossings by bridges or ferries are allowed under reasonable conditions, or if dams are erected under like conditions.

*Cardwell* v. *American Bridge Co.*, 113 U. S. 205, and *Hamilton* v. *Vicksburg, &c., Railroad, ante,* 280, affirmed.

If, in the opinion of a State, its commerce will be more benefited by improving a navigable stream within its borders, than by leaving the same in its natural state, it may authorize the improvements, although increased inconvenience and expense may thereby attend the business of individuals.

A "duty of tonnage," within the meaning of the Constitution, is a charge upon a vessel, according to its tonnage, as an instrument of commerce, for entering or leaving a port, or navigating the public waters of the country.

This was a bill in equity to prevent certain officers of the State of Illinois from exacting tolls upon the vessels of the complainants passing through the improved waters of the Illinois River. Respondents demurred, and the bill was dismissed on the demurrer. Complainants appealed. The case is stated in the opinion of the court.

*Mr. G. S. Eldredge* for appellants.

*Mr. George Hunt,* Attorney General of the State of Illinois, for appellees.

Mr. Justice Field delivered the opinion of the court.

This case comes from the Circuit Court for the Northern District of Illinois. It was heard there and decided on demurrer to the bill of complaint. The substance of the bill is this: That by various acts of her legislature, commencing with one passed in February, 1867, the State of Illinois adopted measures for improving the navigation of Illinois River, including the construction of a lock and dam at Henry, and at Copperas Creek on the river. She created a board of canal commissioners, and invested it with authority to superintend the construction of the locks and dams, to control and manage them after their construction, and to prescribe reasonable rates of toll for the passage of vessels through the locks. By a clause in one of the acts it was provided that all tolls received for the use of the locks, not necessary to keep the same in repair, and to pay the expenses of their collection, should be "paid quarterly into the State treasury as part of the general revenue of the State." Laws of Illinois of 1872, 213, 214.

The works were constructed at an expense of several hundred thousand dollars, which was principally borne by the State. It is represented that a small portion was contributed by the United States. Those at Henry were completed in 1872; those at Copperas Creek in 1877; and the commissioners prescribed rates of toll for the passage of vessels through the locks, the rates being fixed per ton, according to the tonnage measurement of the vessels and the amount of freight carried.

The complainants, citizens of Illinois, composing the firm of Huse, Loomis & Co., are engaged, and have been, since their organization in 1864, in cutting ice at Peru and at other points on the Illinois River, and in transporting it on that river, and thence by the Mississippi and other navigable streams to St. Louis, Memphis, and other Southern markets; and in connection therewith are carrying on a general transportation business, using constantly from three to six steamboats, and from thirty to sixty barges, varying from 125 to 1000 tons, all

licensed and registered under the act of Congress. They allege in the bill, that prior to the construction of the dam across the Illinois River at Henry, they were able to navigate the river without interruption, except such as was incident to its ordinary use in its natural state; that the dams at that place and at Copperas Creek are impediments to the free navigation of the river; that while an additional depth of water is created above them, no practical advantage ensues to the complainants, for they encounter below the dams the same stage of water they would have without them; that the dams are so constructed as to wholly impede, except at extreme high water, the navigation of the river by steamboats and other vessels which were previously accustomed to navigate it, unless they pass through the locks; that from the construction of the lock and dam at Henry in 1872 to the spring of 1878, they have paid as duties or charges upon the tonnage measurement of their steamboats and other vessels about three thousand dollars, and for tolls imposed upon the cargoes of ice transported by them about five thousand dollars; that upon subsequent shipments similar charges have been exacted, as also for the passage of their boats and barges through the lock at Copperas Creek. And they allege that they are advised and believe that the imposition of the tolls and tonnage duties mentioned is in violation: first, of the provision of article four of the ordinance for the government of the territory of the United States northwest of the Ohio River, passed July 13, 1787, which provides, that "the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of the said territory as to the citizens of the United States, and those of any other States that may be admitted into the confederacy, without any tax, impost, or duty therefor;" and, second, of the article of the Constitution of the United States which prohibits the imposing of a tonnage duty by any State without the consent of Congress. Art. 1, § 10. They, therefore, pray that the defendants, who are canal commissioners, and all persons acting under them, may be restrained from exacting any ton-

nage duties or other charges for the passage of their steamboats or barges, and other vessels used by them in navigating the Illinois River, or from interfering in any manner with the free and uninterrupted navigation of the river by them in the usual course of their business.

The questions thus urged upon the consideration of the court below are pressed here; but they are 'neither new nor difficult of solution. The opinion of that court presents in a clear and satisfactory manner the full answer to them, and nothing can be added to the force of its reasoning. In affirming its conclusions, we can do little more than repeat its argument. *Huse* v. *Glover*, 11 Bissell, 550.

The fourth section of the ordinance for the government of the northwestern territory was the subject of consideration in *Escanaba Co.* v. *Chicago*, 107 U. S. 678. We there said that the ordinance was passed before the Constitution took effect; that although it appears by various acts of Congress to have been afterwards treated as in force in the territory, except as modified by them, and the act enabling the people of Illinois Territory to form a Constitution and State government, and the resolution of Congress admitting the State into the Union, referred to the principles of the ordinance, according to which the Constitution was to be formed, its provisions could not control the powers and authority of the State after her admission; that whatever the limitation of her powers as a government whilst in a territorial condition, whether from the ordinance of 1787 or the legislation of Congress, it ceased to have any operative force, except as voluntarily adopted by her after she became a State of the Union; that on her admission she at once became entitled to and possessed of all the rights of dominion and sovereignty which belonged to the original States; that the language of the resolution admitting her was, that she is "admitted into the Union on an equal footing with the original States in all respects whatever;" and that she could, therefore, afterwards exercise the same powers over rivers within her limits as Delaware exercised over Blackbird Creek, and Pennsylvania over Schuylkill River. *Pollard* v. *Hagan*, 3 How. 212; *Permoli* v. *New Orleans*, 3 How. 589; *Strader* v. *Graham*, 10 How. 82.

We also held, in that case, that, independently of these considerations, the terms of the ordinance were not violated because the navigable streams were subject to such crossings as the public necessities and convenience might require. The rivers did not change their character as common highways, if the crossings were allowed under reasonable conditions, and so as not unnecessarily to obstruct them. The erection of bridges with dams, and the establishment of ferries for the transit of persons and property, are consistent with the free navigation of the rivers; and in support of this doctrine we referred to the case of *Palmer* v. *Cuyahoga County*, 3 McLean, 226, 227, where Mr. Justice McLean, speaking of the provision of the ordinance, said: "This provision does not prevent a state from improving the navigableness of these waters by removing obstructions, or by dams and locks so increasing the depth of the water as to extend the line of navigation. Nor does the ordinance prohibit the construction of any work on the river which the state may consider important to commercial intercourse. A dam may be thrown over the river, provided a lock is so constructed as to permit boats to pass with little or no delay, and without charge. A temporary delay, such as passing a lock, could not be considered as an obstruction prohibited by the ordinance."

Since the decision in the Escanaba case, we have had our attention repeatedly called to the terms of this clause in the ordinance of 1787. A similar clause as to their navigable rivers is found in the acts providing for the admission of California, Wisconsin, and Louisiana. The clause in the act providing for the admission of California was considered in *Cardwell* v. *American Bridge Company*, 113 U. S. 205. We there held that it did not impair the power which the State could have exercised over its rivers had the clause not existed; and that its object was to preserve the rivers as highways equally open to all persons without preference to any, and unobstructed by duties or tolls, and thus prevent the use of the navigable streams by private parties to the exclusion of the public, and the exaction of toll for their navigation. The same doctrine we have reiterated at the present term of the

court in construing a similar clause in the act for the admission of Louisiana. *Hamilton* v. *Vicksburg, Shreveport & Pacific Railroad, ante*, 280. As thus construed the clause would prevent any exclusive use of the navigable waters of the State — a possible farming out of the privilege of navigating them to particular individuals, classes, or corporations, or by vessels of a particular character. That the apprehension of such a monopoly was not unfounded, is evident from the history of legislation since. The State of New York at one time endeavored to confer upon Livingston and Fulton the exclusive right to navigate the waters within its jurisdiction by vessels propelled in whole or in part by steam.

The exaction of tolls for passage through the locks is as compensation for the use of artificial facilities constructed, not as an impost upon the navigation of the stream. The provision of the clause that the navigable streams should be highways without any tax, impost, or duty, has reference to their navigation in their natural state. It did not contemplate that such navigation might not be improved by artificial means, by the removal of obstructions, or by the making of dams for deepening the waters, or by turning into the rivers waters from other streams to increase their depth. For outlays caused by such works the State may exact reasonable tolls. They are like charges for the use of wharves and docks constructed to facilitate the landing of persons and freight, and the taking them on board, or for the repair of vessels.

The State is interested in the domestic as well as in the inter-state and foreign commerce conducted on the Illinois River, and to increase its facilities, and thus augment its growth, it has full power. It is only when, in the judgment of Congress, its action is deemed to encroach upon the navigation of the river as a means of inter-state and foreign commerce, that that body may interfere and control or supersede it. If, in the opinion of the State, greater benefit would result to her commerce by the improvements made, than by leaving the river in its natural state — and on that point the State must necessarily determine for itself — it may authorize them, although increased inconvenience and expense may

thereby result to the business of individuals. The private inconvenience must yield to the public good. The opening of a new highway, or the improvement of an old one, the building of a railroad, and many other works, in which the public is interested, may materially diminish business in certain quarters and increase it in others; yet, for the loss resulting, the sufferers have no legal ground of complaint. How the highways of a State, whether on land or by water, shall be best improved for the public good is a matter for State determination, subject always to the right of Congress to interpose in the cases mentioned. *Spooner* v. *McConnell*, 1 McLean, 337; *Kellogg* v. *Union Co.*, 12 Conn. 7; *Thames Bank* v. *Lovell*, 18 Conn. 500; *S. C.* 46 Am. Dec. 332; *McReynolds* v. *Smallhouse*, 8 Bush, 447.

By the terms tax, impost, and duty, mentioned in the ordinance, is meant a charge for the use of the government, not compensation for improvements. The fact that if any surplus remains from the tolls, over what is used to keep the locks in repair, and for their collection, it is to be paid into the State treasury as a part of the revenue of the State, does not change the character of the toll or impost. In prescribing the rates it would be impossible to state in advance what the tolls would amount to in the aggregate. That would depend upon the extent of business done, that is, the number of vessels and amount of freight which may pass through the locks. Some disposition of the surplus is necessary until its use shall be required, and it may as well be placed in the State treasury, and probably better, than anywhere else.

Nor is there anything in the objection that the rates of toll are prescribed by the commissioners according to the tonnage of the vessels, and the amount of freight carried by them through the locks. This is simply a mode of fixing the rate according to the size of the vessel and the amount of property it carries, and in no sense is a duty of tonnage within the prohibition of the Constitution. A duty of tonnage within the meaning of the Constitution is a charge upon a vessel, according to its tonnage, as an instrument of commerce, for entering or leaving a port, or navigating the public waters of the

country; and the prohibition was designed to prevent the States from imposing hindrances of this kind to commerce carried on by vessels.

In *Packet Company* v. *Keokuk*, 95 U. S. 80, 84, that city was authorized by its charter to make wharves on the banks of the navigable river upon which it is situated, and to collect and regulate wharfage, the rates being proportioned to the tonnage of the vessel; and the court held that the charge was not subject to the objection that it was a duty of tonnage within the prohibition of the Constitution. It said: "A charge for services rendered, or for conveniences provided, is in no sense a tax or a duty. It is not a hindrance or impediment to free navigation. The prohibition to the State against the imposition of a duty of tonnage was designed to guard against local hindrances to trade and carriage by vessels, not to relieve them from liability to claims for assistance rendered and facilities furnished for trade and commerce. It is a tax or a duty that is prohibited: something imposed by virtue of sovereignty, not claimed in right of proprietorship. Wharfage is of the latter character. Providing a wharf to which vessels may make fast, or at which they may conveniently load or unload, is rendering them a service." And in *Transportation Co.* v. *Parkersburgh*, 107 U. S. 691, 696, 698, speaking of a charge of wharfage according to the tonnage of a vessel, and a duty of tonnage prohibited by the Constitution, the court said: "They are not the same thing; a duty of tonnage is a charge for the privilege of entering, or trading or lying in, a port or harbor; wharfage is a charge for the use of a wharf." And again, "The fact that the rates (of wharfage) charged are graduated by the size or tonnage of the vessel is of no consequence in this connection. This does not make it a duty of tonnage in the sense of the Constitution and the acts of Congress." *Cannon* v. *New Orleans*, 20 Wall. 577; *Packet Company* v. *Catlettsburg*, 105 U. S. 559.

It is unnecessary to pursue the subject further. We do not see any objections that would justify a disturbance of the decree below, which is accordingly

*Affirmed.*