EMPIRE STATE RAILROAD CORPORATION, Claimant, *v.* STATE OF NEW YORK, Defendant.

(Claim No. 2495-A.)

Court of Claims, October 18, 1928.

*Nottingham, Nottingham & Edgecomb*, for the claimant.

*Merton E. Lewis, Attorney-General*, and *Archie C. Ryder, Deputy Attorney-General*, for the State of New York.

GIBSON, J. This claim was filed by Empire United Railways, Inc., and upon a stipulation reciting that the interest of the said corporation had passed to Empire State Railroad Corporation an order was made on Feburary 24, 1919, substituting the latter as party claimant. By a stipulation dated September 4, 1928, the issues were submitted to the Court of Claims as now constituted for determination.

The claim is for the flooding of the roadbed and tracks of claimant's predecessor in March and April, 1914, by the waters of Onondaga lake by reason of " the raising by the State of the height of the dam across the Oswego River at Phœnix, N. Y., and by keeping the gates closed in the same by the State, and by the maintenance and operation by the State of said dam at said increased height, and with said gates closed." Claimant attempted to amend its claim after trial and incorporate therein as a further cause of the flooding the interference by the State with the flow of the water in the Oswego and Seneca rivers above said Phœnix dam and nearer the sources of said streams. Its motion to amend was denied (113 Misc. 238), and upon appeal the order of this court was affirmed (196 App. Div. 922).

Claimant's predecessor operated a trolley line from Syracuse to

Oswego, a distance of about thirty-seven miles. For a part of the way its tracks ran along the west shore of Onondaga lake. In the early part of April, 1914, the waters of the lake rose to such a height that they spread out over the upland and flooded 9,250 lineal feet of the trolley track. The water rose to an elevation of 370.9 and remained over the tracks several days. The sum of $11,624.26 was expended in temporary repairs to enable the road to operate and in raising the grade of the roadbed from twelve to fifteen inches above its former level. A great part of the work was done after the flood receded and I am unable to segregate the amount it cost to repair the damage occasioned by the flood and the amount expended for permanent betterment. The damages were temporary and if occasioned in the improvement of navigation in the Oswego canal consequential.

The Phœnix dam which preceded the one in suit was erected in 1865 pursuant to chapter 475 of the Laws of 1864. Its elevation was 359.18. Its crest was 440 feet in length. It carried flash-boards eighteen inches in height above said elevation of 359.18, which was a right acquired by prescription. (*Ely* v. *State*, 199 N. Y. 213.) The dam itself was solid masonry with no gates other than those admitting water to raceways of the mills. The new dam at Phœnix was substantially completed in 1911 and fully completed in 1912. It was a Barge canal structure erected pursuant to chapter 147 of the Laws of 1903, which was submitted to the electors at the general election in 1903 and approved. The shore ends were at the same points as the abutments of the old dam and the center was upstream so that the dam resembled in shape the letter " U." Its crest elevation was 363 which was 3.82 feet higher than the old dam and 2.3 feet higher than the old dam with the flashboards in place. The length of its crest was 560 feet, 120 feet longer than the old dam. The longer crest permits a greater discharge at a given velocity. In this dam there are six Taintor gates, each 28 feet 6 inches in width extending to the bed of the river. The watershed which discharges over this dam is 4,940 square miles in area.

The Seneca river, a navigable stream (*Lehigh Valley Railroad Co.* v. *Canal Board*, 204 N. Y. 471, 474), is the outlet of the Finger lakes, drains the Montezuma marshes, where it is joined by the Clyde river and flows easterly to the outlet of Onondaga lake, thence northerly to Three River Point where the Oswego river is formed by the confluence of the Seneca and Oneida rivers. The Oswego river above and below the city of Fulton " has been used for purposes of navigation and commerce." (*Fulton Light, Heat & Power Co.* v. *State*, 200 N. Y. 400, 407.) Between the Phœnix

dam and Three River Point it has been used for navigation and commerce at least for nearly fifty years since the building of the Phœnix dam in 1865. This river flows northerly through Phœnix, Fulton and Oswego into Lake Ontario. The distance from Phœnix dam to Three River Point is two and eight-tenths miles; from the dam to Mud Lock, a few hundred feet easterly of the outlet of Onondaga lake, about nine miles; from the Phœnix dam to the dam at Baldwinsville about fifteen miles. The level of the pool created by the Phœnix dam extends to the foot of the dam at Baldwinsville.

Onondaga lake is fed by streams which in flood bring into it a great flow of water. On March 27, 1914, one of its feeders, Onondaga creek, discharged 3,600 cubic feet per second into the lake. The lake is about seven miles long and from one and one-half to two miles wide with a precipitous watershed of 288 square miles in area. The waters of the lake discharge into the Seneca river a short distance upstream from Mud Lock through Onondaga outlet, a channel about three-fourths of a mile long, and by chapter 147 of the Laws of 1903, section 3, the State was authorized to enlarge the outlet to the size prescribed for the prism of the Erie and Oswego canals. The excavation was made in 1910.

Chapter 147 of the Laws of 1903 authorized the construction of the Oswego canal at a minimum depth of twelve feet. No contention is made that the State created a greater depth of water than required by this act, although some point seems to be made of a note on the plans for the construction of the new dam at Phœnix, contract 80, to the effect that the State would maintain navigation at the maximum navigable elevation of 366.4 in spring stages of water. I do not see how the intention of the State as so expressed can affect the issue here. There must be some maximum above which it is unsafe to maintain navigation and operate the locks in the canal and which will still permit a clearance of fifteen and one-half feet between bridges and the water surface as required by section 3 of said act.

Prior to 1914 the State had widened and deepened the channels of Oswego and Seneca rivers. It had raised the crest elevations of the dams at Baldwinsville and Phœnix. Between Three River Point and Mud Lock in the Seneca river there had been a reef nearly a mile long known as the Gascons. Prior to the Barge canal construction a cut was made through the Gascons for the old canal fifty feet wide and seven feet in depth. This cut was widened and deepened for the Barge canal prior to 1912 to a width of one hundred and fifty to two hundred feet and to a depth of twelve feet. The Gascons before the channel through the reef

was excavated was a natural dam and backed the water up to Mud Lock and beyond. For a given discharge, the excavation would lower the water upstream from the Gascons and provided a larger and smoother channel with a lower velocity. It permits the flow of a greater volume of water at a lower elevation. The engineering experts seem to be in agreement as to the effect of the removal of this great mass of material from the river bed.

The State has the right to widen, deepen and improve the channel of a navigable stream for the benefit of the public in facilitating navigation thereon, and riparian ownership is subject to the obligation to suffer the consequences thereof. The State may perform or direct such acts as it may deem expedient in promotion of the public right of navigation in the channel of a navigable stream without subjecting itself to liability, in the absence of a wanton injury, carelessness, negligence or illegality in performance. (*Fulton Light, Heat & Power Co.* v. *State*, 200 N. Y. 400; *Chase-Hibbard Milling Co.* v. *City of Elmira*, 207 id. 460; *Thompson* v. *State*, 204 App. Div. 684; *Stegmeier* v. *State*, 117 Misc. 626; *Lehigh Valley Railroad Co.* v. *Canal Board*, 146 App. Div. 151, 160; modified, 204 N. Y. 471; *Huse* v. *Glover*, 119 U. S. 543; *United States* v. *Cress*, 243 id. 316.)

In the spring of 1914 the State was carrying on important construction work below the Phœnix dam in the canalization of the Oswego river. It was building the dam at Minetto and dredging the river bed, using coffer dams; it was erecting a new bridge a quarter of a mile below the Phœnix dam, excavating and building a lock at Fulton, all of which was Barge canal improvement work. The division superintendent of canals was instructed by the Superintendent of Public Works to use the utmost care not to do any unnecessary damage to the contractors below the Phœnix dam during the spring flood of 1914. He testified he passed the water through the Taintor gates as fast as possible without destroying the coffer dams below. The Phœnix dam cannot be considered alone in determining the issues involved. It was but one structure in a great enterprise. Just as essential to the end to be attained were the structures in the course of construction and the work in the new channel below the dam. The Superintendent of Public Works had the lawful authority to do whatever was necessary in order to complete the Barge canal. It was not negligence on his part to direct his division superintendent to pass the water through the gates of the Phœnix dam with the utmost care in order to avoid injuring canal structures and canal work below. "The right of the State to make improvements in the river [Oswego] for the benefit of the public, in facilitating navigation and transportation

thereon, must be fully conceded." (*Fulton Light, Heat & Power Co.* v. *State, supra.*)

While we can by adopting the opinion of engineers determine the effect of the raising of the Phœnix dam upon the elevation of the water in Onondaga lake during flood periods, a simpler and more convincing avenue is opened to the lay mind by the exhibits offered by the claimant showing the daily elevations of the water at various points along the rivers and the lake where gauges were maintained by the State during the years from 1905 to 1918. The maximum elevation of the water at Mud Lock in April, 1914, was 370.5, four-tenths of a foot lower than the maximum elevation of the water on the property of claimant's predecessor, so it is apparent that the water was not backing up to reach the trolley tracks. This maximum elevation at Mud Lock of 370.5 occurred on April third and April seventh. The elevation of the water just above the Phœnix dam on April third was 367.6 and on April seventh 367.1 indicating that while the water had dropped half a foot just above the dam it had remained at the same elevation at Mud Lock. The peak of the flood at the Phœnix dam was reached on April second and third when the water reached an elevation of 367.6. From April third until the end of the month the water steadily receded at Phœnix while at Mud Lock during the first ten days in April it was never lower than 370 with a fluctuation of six inches during that time from 370 to 370.5. The elevations of Onondaga lake, taken in Syracuse at the head of the lake, show that the waters of the lake on April third, fourth, fifth, ninth and tenth were at elevation 370.53. The record taken from the gauges shows that while the water was rising at Mud Lock and in Onondaga lake it was falling at the Phœnix dam.

It is also fairly established by the evidence that the water of Onondaga lake has been higher during flood time than it was in the spring of 1914. Many witnesses were sworn as to their recollections of high-water conditions. With one exception the claimant's witnesses testified the water in the spring of 1914 was the highest it had ever been, while the defendant's witnesses testified as to specific times of high water and the elevations were taken at the points they indicated, showing that in 1865 the surface elevation of Onondaga lake was 373.36; in 1867, 371.7 at Mud Lock; in 1902, 370.67 at Mud Lock; in 1873, 373.235 at Mud Lock. The most reliable testimony is that of an engineer who has spent his life on the river, was in charge of the completion of the old Phœnix dam in 1866 and has acted as construction and hydraulic engineer for power companies on the Oswego and Seneca rivers for many years. He states the 1865 flood was the greatest ever

known on the river and estimates the discharge at the Phœnix dam to have been from 30,000 to 35,000 cubic feet per second. The maximum discharge of the Oswego river during the 1914 flood was over 24,000 cubic feet per second. There seems to be a definite relationship between the amount of the discharge and the height of the water a distance upstream from the dam, and owing to the cleaning out of the river bed and making a larger and smoother channel a point in the discharge may be reached where the water at Mud Lock will be at practically the same elevation with the present dam as it was under former conditions. With the gates in the Phœnix dam closed the water at Mud Lock would be higher up to a certain volume of discharge and lower for greater discharges. There is testimony to the effect that with the river discharging 21,100 cubic feet per second the water elevation at Mud Lock would be practically the same with the gates in the dam closed as it was with the old dam, perhaps slightly lower, but as I read the record the gates were open to some extent during this flood.

A river flood is created by conditions outside the river channel. The river is the channel which conveys the yield of the drainage area and the yield is controlled by precipitation or the melting of accumulated snow. A compilation of the reports of the United States Weather Bureau of the precipitation and accumulated snow during the years 1901 to 1917 in the watersheds feeding the Oswego river shows that during March, 1914, the amount of accumulated snow and precipitation was greatly in excess of that of previous years, being over twice as great as in five of the years and a third greater than in the other years except the year 1903, which was a flood year, and in that year the rainfall and snow accumulation was nearly as great as in 1914. So it is apparent that there was in March, 1914, an unusual and as compared with the years of which we have a record before us an unprecedented amount of water coming into Onondaga lake from melting snow and rain, and this evidence confirms my view that the flooding occasioned by the rising waters of the lake was due to excessive discharges of water into it rather than by back water caused by the raising of the dam at Phœnix.

The claim herein should be dismissed.