**CLYDE MALLORY LINES v. STATE ex rel.
STATE DOCKS COMMISSION.**

.1 Div. 822.

Supreme Court of Alabama.

Jan. 24, 1935.

Burlingham, Veeder, Clark & Hupper, of New York City, and Pillans, Cowley & Gresham, of Mobile, for appellant.

Gaillard & Gaillard, of Mobile, for appellee.

BOULDIN, Justice.

The state of Alabama, on the relation of the state docks commission, brought suit against Clyde Mallory Lines to recover a sum alleged to be due for "Harbor Fees" prescribed by order of said commission.

By such order the commission fixed a schedule of "Harbor Fees for the purpose of meeting the expense attendant upon the supervision of the Port and execution of the regulations and providing for the proper accommodation of vessels at this Port."

This schedule included the following:

Vessels under 500 tons—making weekly trips,.......................... $2.50
Vessels under 500 tons,............... 5.00
Vessels 500 tons and over,............ 7.50

Clyde Mallory Lines operates ships in the coastwise trade between New York and Mobile, all over 500 tons, registered tonnage.

The demand sued for covers items accruing wholly under the schedule of "Vessels, 500 tons and over, $7.50."

Special fees are scheduled for "shifting" and "mooring" of vessels.

This harbor fee of $7.50, under the evidence, as well as the tenor of the above order, is a charge against each vessel of that class entering the harbor in the conduct of its shipping business.

This charge is challenged as in violation of two provisions of the Constitution of the United States: First, that it lays a "duty of tonnage" forbidden to any state, without the consent of Congress. Article 1, § 10, cl. 3. Second, that it imposes an unlawful burden on interstate commerce, and violative of article 1, § 8, cl. 3.

The state docks commission is a state agency created in 1923. Gen. Acts 1923, p. 330. Among its duties and powers is the construction and operation of state docks, terminals, and other facilities, in aid of commerce and shipping through the port of Mobile, a state project authorized by constitutional amendment. This function is not here involved.

The state docks commission was also created in lieu of a state harbor commission, and vested with the powers and duties theretofore pertaining to the state harbor commission under chapter 44 of the Code of 1923, section 2427 et seq.; Gen. Acts 1923, p. 330, § 2.

By an Act of January 17, 1927 (Gen. Acts 1927, p. 1), the functions and powers of the state docks commission were further defined.

The jurisdiction of the commission extends over the waters and shores of Mobile river and its tributaries to the head of tidewater, and to the outer bar of Mobile Bay. Code, § 2434; Gen. Acts 1927, p. 1, § 3.

The state docks commission is charged with the "operation" of the harbor and seaport, and empowered to "adopt rules not inconsistent with the provisions of this Act for the purpose of regulating, controlling and conducting the said operation." Gen. Acts 1927, pp. 8, 13, and 14, §§ 9 and 18.

The commission is authorized to "fix from time to time reasonable rates of charges for all services and for the use of all improvements and facilities provided under the authority of this Act." Gen. Acts 1927, p. 12, § 14. See, also, Code, § 2443.

The state docks commission did adopt and promulgate in 1924, and readopt in 1927, rules and regulations, 17 in number, deemed by the commission best adapted to conditions in that harbor.

The inner harbor is defined as beginning at beacon 40 located in the bay, some 2 miles out from the mouth of Mobile river, and extends up the river and tributaries to the head of tidewater, a distance of some 4 miles above the mouth of Mobile river.

The busy shipping zone is in the lower stretches of the river, which is 800 to 1,000 feet in width. The dredged channel for navigation is 500 feet in width up to the state docks, and then narrows to 300 feet.

A synopsis of the rules and regulations above mentioned appear in the report of the case.

Suffice to say here, they look to the safety of vessels and the dispatch of shipping business in the port. For such purpose an active and continuance harbor master service is provided through a chief wharfinger and his deputies.

The supervision thus provided and shown by evidence to be necessary covers services properly referable to "mooring" and "shifting" of vessels for which a special fee is fixed.

But supervision extends to keeping the channel clear, not only by the placement of ships and their proper anchorage, but by controlling rafts, etc.; and protection against fire from the discharge of oils on the waters.

These services may be said to inure to each vessel which enters the harbor and comes within the zone where such supervision affords protection.

Other regulations and the active supervision required to assure their observance constitute a more direct service to each ship.

Each ship is required to notify the harbor master of its arrival; the pilot is required to furnish the shipmaster with a copy of the harbor rules and regulations; and on entering the harbor there is a continuing duty on the state agents to see that the speed rules are observed, and that all ships and craft accommodate their movements so as to effect a fair joint use of the facilities of the port.

■ The evidence well supports a finding that the harbor fee in question is not a tax imposed for the privilege of entering the port, a tax on the privilege of navigation upon the navigable waters, but a charge to cover the expenses of the state agency in supervising and operating the port so that ships may enter and depart from the port in safety and without unnecessary delay; an expense of facilitating navigation, promoting commerce. It is not claimed that the schedule of fees, nor the particular fee in question, is excessive, if permissible for the purposes mentioned.

It may be truly said the general supervision or policing of the harbor to maintain conditions of safety therein in all kinds of weather is for the benefit of the shipping public. But this is true because of service to each ship, as a part of the shipping public. We can discern no difference in principle between a service rendered to the ship on its arrival and that rendered in advance to make the harbor safe to enter on its arrival. The outlay for such service goes to the protection of the ship while in the harbor, and to facilitate its movements therein. The outlay is not for the making of rules and regulations, but for the expenses of a personnel and an equipment of harbor craft to actively "operate" the harbor, to use the wording of the statute, under and in accordance with such necessary regulations. We cannot question that each and every ship shares in this service.

In measuring the benefits so conferred, the classification of ships according to size, "500 tons and over," at one rate, and under "500 tons" at a lower rate, would seem to be unobjectionable, but rather in keeping with the general purpose to make the charges proportionate to the benefits received.

In this connection, special fees for "mooring" and "shifting," chargeable to ships who receive such service, would not seem to bar a separate charge for services common to all ships. To make such special fees yield an income to meet the expense for the services here shown would, we think, unfairly burden vessels receiving these special services, while others sharing in the benefits of such outlays would be relieved. So a schedule fixing sev-

eral charges, each ship subject to one or more as the case may be, but in the aggregate not in excess of the reasonable expense of the service of such ship, seems clearly just.

Does the Constitution of the United States forbid such charges or fees?

■ The decisions of the Supreme Court of the United States are and must be controlling on the question.

In numerous decisions, "duty of tonnage" has been considered and defined. We have considered these cases with care in the light of the facts presented therein.

In many cases the general proposition is stated that all levies by the state, or its authority, for the privilege of entering a harbor, the exercise of the free right of navigation upon navigable waters, are forbidden, being within the evils aimed at by the Constitution. This is true whether such tax is imposed strictly on a basis of tonnage or otherwise.

■ Navigation is a part of commerce, and a tax burden imposed on the one is a burden on the other.

■ Duty of tonnage is forbidden likewise as to vessels navigating the waters of a state, even ships engaged in intrastate commerce. Southern Steamship Company v. Portwardens, 6 Wall. 31, 18 L. Ed. 749; State Tonnage Tax Cases (Cox v. Lott), 12 Wall. 204, 20 L. Ed. 370; Peete v. Morgan, 19 Wall. 581, 22 L. Ed. 201; Cannon v. New Orleans, 20 Wall. 577, 22 L. Ed. 417; Inman Steamship Co. v. Tinker, 94 U. S. 238, 24 L. Ed. 118; Parkersburg & O. River Transportation Company v. Parkersburg, 107 U. S. 691, 2 S. Ct. 732, 27 L. Ed. 584; Gibbons v. Ogden, 9 Wheat. 1, 201–203, 6 L. Ed. 23.

■ On the other hand, fees or charges imposed under state laws for wharfage, pilot service, and quarantine purposes, as compensation for the service, when rendered by private agencies, or to cover the expense of providing such service by state or municipal authority, are not duties on tonnage. Cooley v. Board of Wardens, etc., 12 How. 299, 312, 314, 13 L. Ed. 996; Keokuk Northern Line Packet Company v. Keokuk, 95 U. S. 80, 24 L. Ed. 377; Vicksburg v. Tobin, 100 U. S. 430, 25 L. Ed. 690; Northwestern Union Packet Company v. St. Louis, 100 U. S. 423, 25 L. Ed. 688; Parkersburg & Ohio River Transportation Company v. Parkersburg, supra; Cincinnati, P. B. S. & P. Packet Company v. Catlettsburg, 105 U. S. 559, 26 L. Ed. 1169; Morgan's Louisiana & T. R. & Steamship Co. v. Louisiana Board of Health et al., 118 U. S. 455, 6 S. Ct. 1114, 30 L. Ed. 237;

Huse v. Glover, 119 U. S. 543, 7 S. Ct. 313, 30 L. Ed. 487.

In several of these cases, the court discusses the principles underlying the distinction between tonnage taxes and fees and charges for services or facilities in aid of navigation and commerce.

In Cooley v. Board of Wardens, etc., 12 How. 299, 314, 13 L. Ed. 996, supra, speaking of these provisions of the Federal Constitution, it was said: "This provision of the Constitution was intended to operate upon subjects actually existing and well understood when the Constitution was formed. Imposts and duties on imports, exports, and tonnage were then known to the commerce of a civilized world to be as distinct from fees and charges for pilotage, and from the penalties by which commercial States enforced their pilot-laws, as they were from charges for wharfage or towage, or any other local port-charges for services rendered to vessels or cargoes; and to declare that such pilot-fees or penalties, are embraced within the words imposts or duties on imports, exports, or tonnage, would be to confound things essentially different, and which must have been known to be actually different by those who used this language."

In that case pilot fees, imposed whether a pilot was used or not, were sustained on the ground of the propriety of maintaining a pilot service for protection against dangers of navigation, in the absence of such service. The income from fees, where no pilot was used, went to a pilots' widows' and orphans' fund.

This ruling has been often reaffirmed.

Speaking of harbor regulations in Inman Steamship Company v. Tinker, 94 U. S. 238, 244, 24 L. Ed. 118, supra, it was said: "Similar provisions, varying according to local circumstances, exist at all important points throughout the world whither marine commerce finds its way. They are indispensable to those engaged in that business. They fence out many evils, and promote largely the convenience and the welfare of those engaged in this field of enterprise. Perhaps it is hardly too strong language to say, they are well nigh vital to commerce itself. It may be conceded, also, that foreign steamships and other vessels visiting the ports of a State for business purposes may be made liable by the laws of such State for all reasonable and proper port charges. This is but a fair return for the benefits received."

In that case the charge was imposed strictly on the basis of the registered tonnage of the vessel. From a reading of the facts, in connection with the opinion, it appears the

court deemed the levy oppressive, and without relation to the service rendered. It was held void because a tonnage tax, citing earlier cases. The opinion proceeds: "The tax imposed is not merely a mode of measuring the compensation to be paid. The answer to this suggestion is, that it is exacted where there is nothing to be paid for, and has no reference to any circumstance in this connection but the tonnage of the vessel and the class to which it belongs." 94 U. S. 245, 24 L. Ed. 118.

Reviewing these cases in Morgan's Louisiana & T. R. & Steamship Co. v. Louisiana Board of Health et al., 118 U. S. 462, 463, 6 S. Ct. 1114, 1118, 30 L. Ed. 237, supra, it was said: "But in all these cases the contribution exacted was measured by the tonnage of the vessel in express terms, and the decision of the court rested on that fact."

In Cincinnati, P. B. S. & P. Packet Company v. Catlettsburg, supra, regulations imposing wharfage fees at a municipal wharf and requiring vessels to land at that wharf were sustained as proper and necessary in the particular case for the safety and convenience of ships and other pertinent interests.

In Huse v. Glover, 119 U. S. 548, 7 S. Ct. 313, 315, 30 L. Ed. 487, supra, the state of Illinois installed and operated locks in the Illinois river, charging tolls for the use of the locks, to cover such outlays. These tolls were upheld against an insistence that they were tonnage taxes. Speaking of the ordinance of 1787, providing that the navigable waters in such territory should be free and "without any tax, impost, or duty," the court said: "The exaction of tolls for passage through the locks is as compensation for the use of artificial facilities constructed, not as an impost upon the navigation of the stream. The provision of the clause that the navigable streams should be highways without any tax, impost, or duty, has reference to their navigation in their natural state. It did not contemplate that such navigation might not be improved by artificial means, by the removal of obstructions, or by the making of dams for deepening the waters, or by turning into the rivers waters from other streams to increase their depth. For outlays caused by such works the state may exact reasonable tolls. They are like charges for the use of wharves and docks constructed to facilitate the landing of persons and freight, and the taking them on board, or for the repair of vessels."

Speaking of tonnage duties, it was further said: "A duty of tonnage within the meaning of the constitution is a charge upon a vessel, according to its tonnage, as an instrument of commerce, for entering or leaving a port, or navigating the public waters of the country; and the prohibition was designed to prevent the state from imposing hindrances of this kind to commerce carried on by vessels." 119 U. S. 549–550, 7 S. Ct. 313, 316, 30 L. Ed. 487.

In Northwestern Union Packet Company v. St. Louis, 100 U. S. 423, 427, 25 L. Ed. 688, supra, the court reviewed the various duties imposed on the harbor master of St. Louis, and said: "The duties thus imposed upon the harbor-master, if faithfully discharged, must, it will be conceded, materially advance, and not obstruct or burden trade and business on the Mississippi River, especially at the port of St. Louis. Services rendered by him in the execution of those duties would be in aid, and not a hindrance, of commerce and navigation."

The authority and duty of the state to make proper harbor regulations suited to local conditions and to actively supervise or operate the harbor in accordance with such regulations, in the absence of action by Congress, are now fully settled; that this must entail expense is obvious; that such service is not a hindrance to, but in aid of, shipping, is clear.

The question, then, resolves itself into the simple inquiry: Does the Constitution of the United States contemplate that such service shall be rendered at the expense of the taxpayers or covered by some special fee not applicable to all ships which share the benefits of the service? We think not.

It is not questioned that the fees sued for were for the use of the harbor by appellant's ships in the conduct of the shipping business; that they had the benefit of the services outlined above; that the charges were reasonable for the service named in the order of the commission. Probably the insistence of appellant is that no charge can be made for such service.

In our opinion, the true test, under the decisions as we read them, is: Are the harbor fees a burden and hindrance to navigation and commerce, or are they a just return for the reasonable expense incurred in rendering a service facilitating navigation? Would shipping be better off without such service and no charge or with such service and such charge?

Thus viewing the case, we hold the fees in suit are lawful charges for such service.

Affirmed.

ANDERSON, C. J., and GARDNER and FOSTER, JJ., concur.