**IT IS HEREBY ORDERED** that plaintiff's motion for summary judgment [17] is denied except for the claim for attorneys' fees, and defendant's motions for summary judgment [## 18, 19] are granted, except for the claim for attorneys' fees.

A separate judgment in accord with this opinion is entered this same date.

**CAPTAIN ANDY'S SAILING, INC., a Hawai'i corporation, Plaintiff,**

v.

**Timothy E. JOHNS, Director of the Department of Land and Natural Resources and Chairperson of the Board of Land and Natural Resources, State of Hawai'i; et al., Defendants.**

Civ. No. 00–00051 SOM–LEK.

United States District Court,
D. Hawai'i.

Dec. 28, 2001.

Dennis Niles, Robyn B. Chun, Judy A. Tanaka, Jonathan R. Peterson, Dangkhoa T. Nguyen, Paul Johnson Park & Niles, Wailuku, HI, for plaintiff.

Lynn M. Otaguro, Office of the Attorney General-Hawaii, Lane T. Ishida, Michael Q.Y. Lau, Edsel M. Yamada, Office of the Attorney General-State of Hawaii, Josephine L. Chang, Department of the Attorney General, State of Hawaii, Honolulu, HI, for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

KOBAYASHI, United States Magistrate Judge.

This action against Defendants Gilbert Coloma–Agaran, Mason Young, and Vaughan Tyndzik (collectively "State Defendants") was filed by Plaintiff Captain Andy's Sailing, Inc., ("CASI") on January 20, 2000. The parties consented to trial before a United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), Fed. R.Civ.P. 73 and Local Rule 73.1. This matter came before the Court for trial without a jury on August 21 through 24, 2001.

This Court has examined with care the sufficiency and weight of the evidence before it, the witnesses who testified at trial, the exhibits submitted by the parties, and the trial memoranda submitted by counsel before it. Pursuant to Fed.R.Civ.P. 52(a), the following constitute the Court's Findings of Fact ("Findings") and Conclusions of Law ("Conclusions"). To the extent any of the Findings as stated may also be deemed to be Conclusions, they shall also be considered Conclusions. In the same way, to the extent any of the Conclusions as stated may be deemed to be Findings, they shall also be considered Findings. *See Miller v. Fenton,* 474 U.S. 104, 114–15, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

## I. *FINDINGS OF FACT*

### A. *Parties*

1. CASI was incorporated as a Hawai'i corporation in December 1995, and is engaged in offering boating excursions from state boating facilities on the island of Kauai.

2. Non–Party Andrew Evans ("Mr.Evans") is CASI's president, general manager, and sole shareholder.

3. Gilbert Coloma–Agaran is the Chairperson of the Board of Land and Natural Resources ("BLNR") and has overall responsibility for the Department of Land and Natural Resources ("DLNR"). Defendant Coloma–Agaran is sued in his official capacity only.

4. The DLNR is responsible for the management and administration of Hawai'i's ocean recreation and coastal area programs pertaining to ocean waters, including the state's small boat harbors, launching ramps, and offshore mooring areas.

5. Mason Young ("Defendant Young") is the Acting Administrator of the Division of Boating and Ocean Recreation ("DOBOR"). DOBOR is the administrative unit within DLNR responsible for the management of Hawai'i's ocean recreation and coastal area programs pertaining to ocean waters, including the state's small boat harbors, launching ramps, and offshore mooring areas. As Acting Administrator of DOBOR, Defendant Young has overall

responsibility for administration of state boating facilities, including the supervision of the district managers for each island district. Defendant Young is sued in his official capacity only.

6. Vaughan E. Tyndzik ("Defendant Tyndzik") is the Kauai District Manager of DOBOR. As Kauai District Manager, Defendant Tyndzik has the day-to-day responsibility for oversight and management of DLNR's boating facilities at Kukuiula Small Boat Harbor ("Kukuiula SBH") and Port Allen Small Boat Harbor ("Port Allen SBH"). Defendant Tyndzik is sued in his official capacity only.

7. The administrative divisions of the DLNR include DOBOR, and the Division of Conservation and Resource Enforcement ("DOCARE").

8. The responsibilities of DOCARE include enforcement of the rules relative to the control and management of Kukuiula SBH and Port Allen SBH, and the rules regulating vessels and their use in the ocean waters of the state.

9. DOCARE and DOBOR are independent divisions of the DLNR, and there is no agreement between them with respect to the enforcement of state law concerning boating, boating safety, conservation or search and rescue.

## B. *The Vessels*

10. Since 1994, CASI (or its predecessor in interest Andrew Evans dba South Shore Sailing) operated the vessel "Spirit of Kauai," a 54 foot catamaran, from Kukuiula SBH pursuant to commercial permits issued by DOBOR. CASI (or its predecessor in interest) also operated "Spirit of Kauai" from the Port Allen SBH from 1994 to January 1999 under "vessel moored elsewhere" permits issued by DOBOR. In August of 1998, CASI also obtained a commercial permit to operate "Spirit of Kauai" from the Port Allen Commercial Pier.

11. Since December of 1999, CASI has operated a second vessel, the 64.5 foot catamaran "Hula Kai," from the Port Allen Commercial Pier. "Hula Kai" has never operated from any other facility.

12. In December 1993, "Spirit of Kauai" was inspected by the United States Coast Guard and issued a Certificate of Inspection authorizing operation of the vessel in the "Coastwise: Pacific Ocean Area, Island of Kauai, State of Hawai'i, not more than 20 miles from shore."

13. In October 1999, "Hula Kai" was inspected by the United States Coast Guard and issued a Temporary Certificate of Inspection authorizing operation of the vessel in the "Coastwise: Pacific Ocean Area, Islands of Kauai and Niihau, State of Hawai'i, not more than 20 miles from shore."

14. "Spirit of Kauai" and "Hula Kai" have been documented by the United States Department of Transportation as vessels of the United States.

## C. *State Boating Facilities at Kukuiula and Port Allen*

15. Kukuiula SBH and Port Allen SBH are public boating facilities on the island of Kauai under the jurisdiction of the DLNR.

16. At Kukuiula SBH, CASI has had the use of the following facilities and services: a loading wharf, mooring area, breakwater, launch ramp, lit navigational aids, wash down facility, limited parking, and security lights.

17. The Commercial Pier at Port Allen is under the jurisdiction of the Hawaii Department of Transportation ("DOT").

18. The DOT Commercial Pier at Port Allen is adjacent to Port Allen SBH.

19. At Port Allen SBH, CASI had the use of a loading dock, breakwater, navigational lights, wash down facility, public restroom, limited parking, security lights, and access to the harbor when operating

"Spirit of Kauai" under the terms of CASI's vessel moored elsewhere permit.

20. The commercial pier at Port Allen is adjacent to the Port Allen SBH.

### D. *Assessment of DLNR and DOT Use Fees*

21. Haw.Admin.Rule ("HAR") § 13–234–25(a)(1), provides, in relevant part, the following:

> For vessels with a commercial and regular mooring permit. The fee per month, per vessel, for mooring of and use of the small boat harbor ... by commercial vessel ... shall be two times the mooring fees prescribed in section 13–234–3 or two percent of the monthly gross receipts, whichever is greater.

*Id.*

22. The fee assessed by DOBOR for "Spirit of Kauai's" commercial use of Kukuiula SBH is made pursuant to HAR § 13–234–25(a)(1).

23. HAR § 13–250–5 defines "Ocean recreation management area" to mean "ocean waters of the State that have been designated for specific activities as described in Chapter 13–256, Hawai'i Administrative Rules, Ocean Recreation Management Rules and Areas." The acronym for ocean recreation management area is "ORMA".

24. HAR § 13–250–5 defines "Ocean waters" as "the waters seaward of the shoreline within the jurisdiction of the State."

25. In 1988, the state designated the North Shore of the island of Kauai as an ORMA. The North Shore Kauai ORMA includes the "Na Pali Coast ocean waters," an area that comprises approximately ten (10) square miles of open ocean offshore of the Na Pali Coast State Park. These ocean waters are "navigable."

26. DOBOR requires small passenger vessel owners wishing to operate in designated ORMA areas, such as the Na Pali Coast ocean waters or Kaanapali shore waters, to hold a commercial permit or a DOBOR commercial permit for a state boating facility under the jurisdiction of DLNR (e.g., a state boat launching ramp, designated offshore mooring area or state small boat harbor).

27. A condition of the ORMA permit required by DOBOR to operate "Hula Kai" commercially within the Na Pali coast ocean waters is payment of two percent (2%) of the permitted vessel's gross receipts.

28. HAR § 13–256–12(a) defines "gross receipts" to mean "all moneys paid or payable to the account of the commercial permittee, for services rendered, or resulting from trade, business, commerce, or sales by the vessel or water sports equipment owner when the services, trade, business, commerce, and sales have a direct relationship to the vessel."

29. As construed by DOBOR, the term "gross receipts" includes two percent (2%) of the vessel's gross receipts for income earned by the permitted vessel, including income earned from activities conducted in ocean waters outside of the North Shore Kauai ORMA.

30. DOBOR has the capability to allocate costs and revenues to specific areas through the use of cost centers, and has designated certain areas as cost centers. DOBOR has not designated the Na Pali Coast ocean waters as a cost center.

31. The DLNR regards the two percent (2%) use fee as the charge for access to operate in certain areas within an ORMA for commercial purposes.

32. In October 1998, DOBOR announced its intent to assess CASI and other commercial boat operators operating from the Port Allen Commercial Pier an "additional" fee equal to two percent (2%) of their vessels' gross receipts.

33. In August 1999, CASI received a commercial permit from the DOT allowing "Hula Kai" to operate commercially at the DOT Commercial Pier at Port Allen. The charge for this commercial permit was the greater of $703.50 per month or 1.85% of the vessel's monthly gross receipts.

34. In August 1999, CASI also received a mooring permit from DOT, which allowed the vessel "Hula Kai" to moor at the DOT Commercial Pier at Port Allen.

35. In November 1999, the state DOT issued CASI permits authorizing the mooring and commercial operation of "Hula Kai" from the DOT Commercial Pier at Port Allen.

36. CASI commenced commercial operation of "Hula Kai" from the DOT Commercial Pier at Port Allen in December 1999.

37. Shortly thereafter, Defendant Tyndzik reminded Mr. Evans that in order to operate "Hula Kai" within the Na Pali Coast ocean waters CASI, would be required to have an ORMA permit and pay DOBOR two percent (2%) of the vessel's gross receipts.[1] The DOBOR two percent (2%) use fee was in addition to the use fee required by the DOT.

38. DOBOR does not require holders of commercial use permits for a DLNR small boat harbor or launch ramp to secure an ORMA permit or pay an additional two percent (2%) use fee in order to operate within the Na Pali Coast ocean waters.

39. In May 2000, CASI applied to DOBOR for a permit to operate "Hula Kai" in the Na Pali Coast ocean waters.

40. In July 2000, State Defendants issued CASI Ocean Recreation Management Area Commercial Permit No. K01–005 authorizing operation of "Hula Kai" on the Na Pali Coast ocean waters (the "ORMA Permit"). The ORMA Permit does not authorize use of any state boating facilities including those at Port Allen SBH.

41. CASI thereupon commenced providing excursions of the Na Pali Coast ocean waters aboard "Hula Kai."

42. The ORMA Permit assessed a charge of $75.00 per month, or two percent (2%) of the vessel's gross receipts, whichever was greater ("ORMA Fee").

43. DLNR offers facilities (i.e., navigational range at Nualolo Kai) and regulatory services (i.e., occasional patrols in the area) within the Na Pali Coast ocean waters but there was no evidence presented by State Defendants of the amount incurred by DLNR for these facilities and services in the Na Pali ocean waters, nor any relationship between any such amount and the ORMA fee.

44. In or about June 2001, CASI applied to DOBOR for renewal of the ORMA Permit.

45. CASI's application was accompanied by payment of the $15.00 fee for renewal of commercial permit prescribed by HAR § 13–234–16(2).[2]

---

1. HAR § 13–256–41(b) provides, in relevant part, the following:

> No person shall navigate a commercial motorboat ... within Na Pali Coast ocean waters except for persons who have been issued a permit by the department to operate within the Na Pali Coast ocean waters in accordance with this subchapter.
> *Id.*

HAR § 13–256–11(a)(3) provides, in relevant part, the following:

> Commercial operating area use fee. A monthly commercial use permit fee shall be the greater of $75.00 per month, payable in advance, or 2% of the monthly gross receipts.
> *Id.*

2. In relevant part, HAR § 13–234–16 provides:

> *Permit processing fees.* The charge for the processing of a use permit shall be as fol-

46. DOBOR reissued the ORMA permit for a twelve month term, effective July 20, 2001.

47. The 2001 ORMA Permit provided that CASI may operate "'Hula Kai' in a commercial capacity in the Ocean Recreation Management Area Waters of Kauai." The commercial activity is described as "NA PALI COAST SCENIC TOURS. PASSENGERS AND PROVISIONS WILL BE CONDUCTED AT THE DOT PORT ALLEN COMMERCIAL PIER."

48. Paragraph 7 of the 2001 ORMA Permit provided further:

This commercial permit may be terminated by the Department by written order of its representatives for proper cause and the said vessel will cease commercial operations on THE OCEAN RECREATION MANAGEMENT AREA OF KAUAI.

49. The 2001 ORMA Permit reiterated that "[t]he permit charges are for the privilege of operating this commercial vessel on THE OCEAN RECREATION MANAGEMENT AREA OF KAUAI in the manner stated above."

50. According to Defendant Young's predecessor, Howard Gehring ("Mr.Gehring"), ecosystem preservation involves protecting against short and long-term degradation by limiting the amount of activity in an area, as well as the number of vessels and/or persons entering that area.

51. However, State Defendants do not possess any studies, assessments, reports, or analyses of any kind relating to the impact of activities of and/or the carrying capacity of marine vessels in the Na Pali Coast ocean waters.

52. State Defendants presented no evidence relating to the impact of tour boats such as "Hula Kai" on the marine environ-ment while operating within the Na Pali Coast ocean waters.

53. Furthermore, the DNLR has not limited the number of permits that can be issued for the Na Pali Coast ocean waters as part of any such preservation effort.

54. Within DOBOR, there are four separate districts: Kauai, Oahu, Maui, and Hawai'i.

55. Revenues generated from the four districts are deposited into the Boating Special Fund.

56. Essentially all DOBOR revenues, including permit revenues and vessel registration fees, are aggregated in a single "Boating Special Fund." The monies in the Boating Special Fund are then used, at least in part, to fund DOBOR's operational expenses, as well as contract services, utilities and facilities management.

57. Accordingly, all expenses related to the regulation of commercial boating and the management and upkeep of DLNR boating facilities on Kauai are paid from the Boating Special Fund.

58. DOBOR does not segregate expenses associated with any particular regulated area or boating facility except for the costs of specific maintenance, utilities, or personnel.

59. According to Kevin Yim, who was employed by DNLR as an auditor, DOBOR has the capability to allocate both expenses and revenues to specific areas through the use of cost centers. However, DLNR reports most expenses on an island-wide basis and not by individual cost center. While DLNR reports revenues by identifying the cost center generating the revenue, there are some revenues that are not identified with a specific cost center or

lows … [r]enewal of commercial permit … $15.

*Id.*

area and these revenues are lumped into a statewide category.

60. The record reveals that the Na Pali Coast ocean waters has not been identified as a cost center. Thus, DOBOR is unable to account for any expenses incurred for facilities and services for the Na Pali Coast ocean waters and cannot quantify the cost related to the regulation and maintenance of this area.

61. Particularly instructive in this regard is Mr. Gehring's testimony. Mr. Gehring testified that during his tenure as DOBOR's acting administrator he had attempted to quantify the cost of administering regulations in the Na Pali Coast ocean waters, but had been unable to do so. Additionally, Mr. Gehring specifically stated that there is no identifiable expense that could be attributed to the Na Pali Coast ocean waters.

62. David Parsons' ("Mr. Parsons") testimony is also compelling. Mr. Parsons, boating special projects officer for DOBOR, stated that the ORMA Fee is aggregated with all other fees in the Boating Special Fund.

63. While Mr. Parsons alluded to use of the Boating Special Fund to defray program costs specific to ORMA areas, i.e., management of areas under ORMA rules, he acknowledged that the Boating Special Fund is used to pay expenses on a statewide basis.

64. Mr. Parsons conceded that twenty percent (20%) of DOBOR revenues, including those generated from ORMA Fees, are automatically transferred to the Office of Hawaiian Affairs. However, State Defendants produced no evidence that the Na Pali Coast ocean waters fall within ceded lands nor a basis for levying this charge against "Hula Kai."

65. While State Defendants did present testimony that DOBOR conducts "spot checks" of the Na Pali Coast ocean waters on an irregular basis, there was no evidence presented to substantiate those efforts. Defendant Tyndzik testified that he personally participated in spot checks, however, the Court finds from his testimony that his activities were more in the nature of "orientation" than "regulatory" efforts.

66. Defendant Tyndzik's responsibilities as Kauai District Manager do not include marine law enforcement. There is no agreement between DOCARE and DOBOR with respect to the enforcement of boating law or concerning boating safety, conservation, and search and rescue, and the evidence consistently demonstrates that DOBOR has no ability to control or monitor DOCARE's activities in this area, or any other for that matter.

67. DLNR transfers funds from the Boating Special Fund to DOCARE by journal voucher. DOCARE does not render an invoice for its services, nor does it disclose the nature or purpose of the expenditure, or the geographical area benefitted by the expenditure.

68. In the period 1997 through March 2001, DOCARE received from the Boating Special Fund the following sums:

| | |
|---|---|
| 1997 | $800,000.00 |
| 1998 | $802,371.12 |
| 1999 | $966,000.00 |
| 2000 | $925,000.00 |
| 2001 (to 3/17) | $525,000.00 |

69. To the extent DOCARE's marine law enforcement activity could be said to benefit CASI, State Defendants produced no evidence that the ORMA Fees paid by CASI were transferred to or used by DOCARE for that purpose.

70. Although the evidence indicates that DOBOR reimburses certain DOCARE expenses, including those for ma-

rine law enforcement, there was no showing that DOBOR has the ability to control or monitor DOCARE's activity in the area, or to ensure that DOCARE is using assessments against the Boating Special Fund for purposes relating to the state boating program.

71. As a result, the record does not permit the Court to determine the nature or purpose of DOCARE's expenditures of the funds received from the Boating Special Fund or the specific geographic area benefitting from those expenditures.

72. As of March 27, 2001, CASI had paid DOT commercial use fees on the gross receipts earned by "Hula Kai" operating from the DOT Commercial Pier as follows:

| | |
|---|---|
| FY 1999 | $ 711.57 |
| FY 2000 | $41,765.99 |
| FY 2001 | $14,679.56 |

73. As of March 27, 2001, CASI paid DLNR ORMA Fees on the gross receipts earned by "Hula Kai" operating from the DOT Commercial Pier as follows:

| | |
|---|---|
| FY 2000 | $16,714.09 |
| FY 2001 | $15,869.80 |

E. *Issuance, Renewal and Claimed Rejection of the VME Permit*

74. While doing business as South Shore Sailing, Mr. Evans was issued a commercial permit that allowed him to operate "Spirit of Kauai" as a commercial passenger vessel from Kukuiula SBH. DOBOR issued the permit in January 1994, and has renewed it annually since.

75. In 1994, DOBOR also issued Mr. Evans the first of a series of annual commercial permits authorizing him, and later CASI, to operate "Spirit of Kauai" at Port Allen SBH as a "vessel moored elsewhere" (the "VME Permit"). The VME Permit was issued by DOBOR pursuant to HAR § 13–231–59. Essentially, the "Spirit of Kauai" was allowed to operate at Port

Allen SBH during the day, but was required to moor at the Kukuiula SBH at night. No other vessel has been issued a VME Permit for the island of Kauai since 1994.

76. Hurricane Iniki hit the island of Kauai in September 1992. Since that time, use of Port Allen SBH by other users of the harbor has greatly increased.

77. CASI's last annual VME permit expired in October 1998.

78. In July 1998, Defendant Tyndzik informed CASI of an amendment of the VME Permit that restricted the operation of "Spirit of Kauai" from the loading dock at Port Allen SBH.

79. CASI applied to DOT for a permit to operate "Spirit of Kauai" from the Port Allen Commercial Pier.

80. In August 1998, DOT issued CASI a commercial permit authorizing the operation of the "Spirit of Kauai" from the pier. The permit was valid through July 31, 1999, and was subject to annual renewal. The charge for the permit was the greater of $294.80 or 1.85% of the vessel's monthly gross receipts.

81. CASI applied for renewal of the VME Permit in October 1998.

82. The process of renewal is the same whether the commercial vessel is operating from a DLNR harbor, launching ramp or as a "Vessel Moored Elsewhere."

83. CASI's application for renewal of the VME Permit was reviewed by Florence Rasay, a clerk/typist who works for DOBOR in the Kauai District Office.

84. It was Ms. Rasay's practice to review the application for completeness and then to prepare the two page permit using the expiring permit as a template. She would then attach the draft permit to the file for review by Defendant Tyndzik.

85. Additional terms and conditions may be stated by addendum to the two page permit.

86. The two pages comprising the commercial permit, and any addendum, are not stapled until after the permit has been signed by both the applicant and DOBOR's District Manager.

87. On October 27, 1997, CASI received a 30-day VME permit, which allowed "Spirit of Kauai" to operate commercially at Port Allen SBH. This permit was valid for the period from October 27, 1998 to November 25, 1998. There was no addendum to this VME Permit.

88. CASI received a second 30-day VME Permit, commercial permit no. K99-014(2), which allowed "Spirit of Kauai" to operate commercially at the Port Allen SBH from November 26, 1998 to December 25, 1998.

89. The second 30-day permit included, for the first time, an addendum with restrictions on the use of Port Allen SBH.

90. The addendum provided, among other things, that "[f]ueling, mechanical, loading and unloading of passengers and crew beyond 30 minutes, use of restroom facilities, trash receptacles and maintenance prohibited."

91. CASI received a third 30-day VME permit, commercial permit no. K99-014(3), which allowed "Spirit of Kauai" to operate commercially at the Port Allen SBH from December 26, 1998 to January 24, 1999.

92. CASI was orally informed on January 15, 1999 that the VME Permit was not going to be renewed. On February 3, 1999, DOBOR informed CASI in writing that DOBOR would not renew the VME Permit.

93. Since 1998, other than the discontinued commercial operations at Hanalei, Ms. Rasay could not recall another instance when DOBOR declined to reissue a commercial permit.

94. By letter dated February 11, 1999, CASI requested a contested case hearing pursuant to section 91-9, Hawai'i Revised Statutes ("HRS"), to contest DOBOR's reasons for withholding the VME Permit. DOBOR subsequently denied the request.

95. On May 4, 1999, then BLNR chairperson and former defendant Timothy Johns ("Mr. Johns"), Mr. Gehring, and Mr. Parsons met with Mr. Evans and others to discuss several issues including: (1) DOBOR's denial of CASI's request for reissuance of its VME Permit for the "Spirit of Kauai," and (2) the two percent (2%) fee assessed against commercial operators using the DOT commercial pier at Port Allen.

96. At the conclusion of the May 4, 1999 meeting, Mr. Johns proposed to have DOBOR issue a VME Permit "under the same conditions as imposed under the prior VME permit." Mr. Evans, however, understood that the VME permit would be issued with "reasonable" conditions that were still to be negotiated.

97. By letter dated May 17, 1999, CASI suggested to DOBOR terms and conditions which could be incorporated into the renewed VME Permit.

98. On June 4, 1999, having received no word from DOBOR as to when the VME Permit would be available, Mr. Evans appeared at the Kauai District Office to inquire about the status of the VME Permit and was given an addendum which contained the following terms and conditions:

2. Conditions of this permit:

A. Utilize Port Allen Small Boat Harbor's loading dock for the sole purpose of embarking and disembarking passengers when displaced from DOT, Port Allen pier e.g. fuel barge day.

B. Active loading and unloading only, i.e., no stand-by time.

C. Capt. Andy's Sailing, Inc. vessel with beam exceeding 17' must use the north by north west (or leeward) side of the loading dock.

D. Preferential use of the fish hoist side of dock is for recreational fishing vessels, subsistence fisherman, and fishing related activities.

E. While at Port Allen Small Boat Harbor facility the commercial charter company is responsible for its clientele before and after the charter thus clients must be directed in a safe and expedient manner to and from the shuttle bus.

F. Capt. Andy's Sailing, Inc. may utilize (1) car space for parking.

3. Prohibited are the following:

A. Commercial vessel's clientele walking up and down Port Allen Small Boat Harbor entrance road.

B. Fueling or repairing vessels at loading dock.

C. Commercial vessel's clientele from using DOBOR restroom facilities.

D. Parking of any vehicle within harbor property (including crew and company vehicles).

E. Dunnage generated by charters using dumpsters or trash cans.

F. Shuttle buses exceeding twenty-five (25) passengers (motor coach buses must have prior approval).

G. Shuttle buses from parking on site.

99. Mr. Evans recognized that the addendum contained terms and conditions not found in any prior permit.

100. Ms. Rasay testified that she gave Mr. Evans the permit when he came into the office, but that he returned it to her without signing.

101. While Mr. Gehring did not witness this encounter, he regarded the statements Ms. Rasay attributed to Mr. Evans as evidence of an intent to reject the VME Permit.

102. Consequently, Mr. Gehring wrote a letter dated June 17, 1999, to Mr. Evans stating, in pertinent part:

Based on the discussions and minutes from the May 4, 1999, meeting with you and your client, the subject VME permit was prepared. It held the same conditions as imposed on the prior permit, and at your request, was consistent with other permits for the activities intended. When the permit was presented to Mr. Evans in person for a signature he rejected it and instead placed question marks adjacent to the provisions and left it with Mr. Tyndzik. Since then new information has come to light that we do not believe was provided at the May 4, 1999 meeting. We have asked Vaughn Tyndzik to hold up the issuance of any VME permits on Kauai until further notice.

103. State Defendants point out that Mr. Evans at no time thereafter contacted Mr. Gehring to correct the so called misperception, nor did Mr. Evans either accept the permit or discuss the issue.

104. State Defendants' characterization, however, is not supported by the evidence. Rather, it is clear that the "permit" offered to Mr. Evans was in fact only a proposed draft permit.

105. While Mr. Gehring's letter of June 17, 1999, states that the "permit" contained the "same conditions as imposed on the prior permit," the proposed new conditions in the addendum were substantially more restrictive than those imposed by the prior permit.

106. Under the circumstances, a VME Permit was not ready for Mr. Evans to sign, much less reject.

107. Even had Ms. Rasay given Mr. Evans a "complete" VME Permit, and the

Court finds that she did not, there is no basis for State Defendants' claim that it was rejected by Mr. Evans.

108. Mr. Evans testified that he marked the addendum with a question mark because the conditions proposed were not in accordance with his understanding of what had been agreed upon earlier.

109. Mr. Evans also denied telling Ms. Rasay that he rejected the permit. He testified that instead he told her that he wished to review the permit terms with his attorney.

110. While Ms. Rasay and Mr. Gehring apparently took Mr. Evans' comments as a rejection of the permit, the Court finds that Mr. Evans did not intend to reject the permit. Moreover, the Court finds reasonable Mr. Evans' desire to discuss the addendum with counsel, given that the draft permit proposed drastic restrictions not previously imposed.

111. Mr. Evans testified at trial that compliance with these terms effectively precluded "Spirit of Kauai" from the Port Allen loading dock.[3] For example, Mr. Evans stated that the conditions limiting passenger loading made dispatching two trips per day extremely challenging. Further, Mr. Evans testified that he encountered significant difficulties in scheduling bus pick-ups and/or drop-offs for the rapid departures, and explained that operating in this manner unduly burdened CASI's tour boat operations.

112. State Defendants assert that the terms of the addendum were within their authority under HAR § 13–231–59, given the increase in harbor activity that has occurred over the years.

113. Defendant Tyndzik claimed this increase in harbor activity, including in particular from CASI's commercial passenger activity, had exacted a considerable drain on DLNR's limited resources and facilities at Port Allen.

114. Defendant Tyndzik also asserted that the restrictions were necessary to appease certain recreational users who complained they had been displaced from the harbor.

115. Despite State Defendants' assertions to the contrary, the Court finds the new restrictions unreasonable. State Defendants failed to produce evidence demonstrating that all of the restrictions contained in the addendum are in fact necessary to reduce congestion or achieve more efficient use of Port Allen SBH. Rather, the conditions, which have not been identically imposed on other permit holders and/or users of the harbor, appear to unfairly single out CASI and be punitive in nature.

116. This Court finds persuasive Mr. Evans' testimony that compliance with the restrictions would impose a sizeable burden on CASI's normal business operations.

117. Furthermore, notwithstanding the increase in activity at Port Allen SBH,

---

**3.** The second 30–day permit, valid for the period from November 26, 1998 to December 25, 1998, included, for the first time, restrictions on the use of Port Allen SBH such as the following:

Fueling, mechanical, loading and unloading of passengers and crew beyond 30 minutes, use of restroom facilities, trash receptacles and maintenance prohibited.

Multi-hull vessels with a beam of 17' or more are restricted to use of the northwest facing dock only. The hours of operations shall not conflict with recreation commercial fishing or any special events. Dock area can *only* be used on fuel barge days. The third 30–day permit, contained the same restrictions.

As a result, CASI has had to maintain its operations in compliance with at least some of the conditions and/or prohibitions listed on the addendum. Accordingly, this Court finds persuasive Mr. Evans' testimony as to their substantial impact on CASI's normal business operations.

CASI submitted evidence demonstrating that Lahaina small boat harbor ("Lahaina SBH") on the island of Maui, which has even greater demands on its facilities, has been able to bolster efficient use of this harbor without imposing such restrictions.

118. DOBOR issues VME permits to vessels operating from Lahaina SBH, a harbor which serve a mix of commercial and recreational vessels, including ferries licensed by the Hawai'i PUC, and cruise ships engaged in interstate commerce.

119. The loading dock at Lahaina SBH is also the site of several annual recreational events including the Lahaina Jackpot fishing tournament. Despite the evident demands on this facility, DOBOR has issued and renewed annually more than 20 VME permits allowing commercial passenger vessels to embark and disembark passengers at the harbor's loading dock. These Lahaina VME permits do not contain restrictions such as those contained in the addendum in the addendum proposed by DOBOR.

120. James Coon, owner of a commercial tour boat company which operates vessels out of Lahaina SBH, testified that the restrictions contained in the addendum are unnecessary because the VME vessel operators use cooperative action to ensure the smooth flow of harbor use at Lahaina SBH.

## II. *CONCLUSIONS OF LAW*

### A. *Jurisdiction*

1. This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1331.

2. CASI's second amended complaint sought equitable relief asserting five claims for relief against State Defendants. At trial, four claims remained, specifically whether: (1) State Defendants' fee assessment of two percent (2%) of "Spirit of Kauai's" gross receipts for a commercial permit to operate from Kukuiula SBH was an unconstitutional duty of tonnage; (2) State Defendants' fee assessment of two percent (2%) of "Hula Kai's" gross receipts for an ORMA Permit to operate commercially in the Na Pali Coast ocean area was an unconstitutional duty of tonnage; (3) State Defendants' fee assessment of Spirit of Kauai's gross receipts for a commercial permit to operate from Kukuiula SBH violated the substantive due process clause of the Fourteenth Amendment; and (4) State Defendants violated the Fourteenth Amendment's procedural due process clause when State Defendants failed to provide an administrative hearing after the permit was terminated.

### B. *Doctrine of Law of the Case*

3. The law of the case doctrine was developed to "maintain consistency and avoid [needless] reconsideration of matters once decided during the course of a single continuing lawsuit." 18 Wright, Miller & Cooper, Federal Practice & Procedure § 4478 at 788; *see also Copeland v. Merrill Lynch & Co., Inc.,* 47 F.3d 1415, 1423 (5th Cir.1995) (once court of competent jurisdiction decides rule of law, that decision governs the same issues in subsequent stages of the same case); *Slotkin v. Citizens Cas. Co.,* 614 F.2d 301, 312 (2d Cir.1979) (" '[T]he law of the case' does not constitute a limitation on the court's power but merely expresses the general practice of refusing to reopen what has been decided."). For the doctrine to apply, the issue in question must have been "decided explicitly or by necessary implication in [the] previous disposition." *Liberty Mutual Ins. Co. v. EEOC,* 691 F.2d 438, 441 (9th Cir.1982).

4. A court properly exercises its discretion to reconsider an issue previously decided in only three instances: 1) the first decision was clearly erroneous and would result in manifest injustice; 2) an

intervening change in the law has occurred; or 3) the evidence on remand was substantially different. *See Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir.1990).

■ 5. Here, Judge Mollway issued, on August 2, 2000, an Order Denying Cross–Motions for Partial Summary Judgment on Second Claim for Relief in First Amended Complaint ("2000 Order"), and on April 30, 2001, an Order Granting in Part and Denying in Part Defendants' Motion to Dismiss; Order Denying Plaintiff's Cross–Motion for Summary Judgment; Order Denying Plaintiff's Request for Preliminary Injunction ("2001 Order").

6. The 2000 Order addresses CASI's second claim for relief—that the two percent (2%) ORMA Fee assessed by the DLNR–DOBOR is an unlawful "duty of tonnage." In that order, Judge Mollway reviewed the case law surrounding tonnage duties, and stated that a fee becomes a prohibited duty of tonnage when it is essentially a duty or tax for use of public waters; conversely, fees are not prohibited when they are charged for direct or general services provided. *See* 2000 Order at 9–13.

7. Based on the evidence submitted, Judge Mollway denied summary judgment finding that genuine issues of fact existed as to the purpose and use of the ORMA Fee and as to the reasonableness of that fee. *See id.* at 22. In so ruling, the Judge offered the following guidance:

> This court cannot, on the present record, determine whether the ORMA Fee is imposed for the commercial use of the Na Pali Coast ocean waters or for the cost of regulating those waters. Even if the ORMA Fee is charged for regulation of the waters, the court cannot tell

whether the ORMA Fee is actually being used for that purpose.... If the purpose of the ORMA Fee is to tax the use of the Na Pali Coast ocean waters, the ORMA Fee is an unconstitutional duty of tonnage. If, however, the fee is charged and used to pay for the regulation of the Na Pali Coast ocean waters, the constitutional prohibition against duties of tonnage does not appear to be implicated.

*Id.* at 19.

8. The 2001 Order dismissed, based on Eleventh Amendment immunity, CASI's third and fifth claim to the extent they were based on violations of state law, but not as violations of the Constitution. *See* 2001 Order at 20. The 2001 Order also denied summary judgment as to CASI's third and fifth claims for relief. Specifically, the Court concluded that questions of fact exist regarding whether the two percent (2%) fee has a substantial relation to public health, safety, morals, or general welfare, and regarding the "offer and refusal" of the VME Permit.[4] *See id.* at 20–21.

9. The doctrine of law of the case applies here. The parties do not contend that a change in controlling authority has occurred since Judge Mollway's prior decisions, nor do they suggest that the decisions are clearly erroneous. Rather, the stated principles of law, and in particular the "duty of tonnage" cases, are well-settled and generally accepted. Moreover, with the exception of the VME issue, neither party has submitted evidence affecting those rulings. Accordingly, Judge Mollway's prior rulings are law of the case, and the Court refrains from revisiting those issues decided therein.

---

4. The Court also found that CASI had a property interest in the VME permit based on the State's apparent concession that CASI was

entitled to the permit in issue. *See* 2001 Order at 18.

10. With respect to the terms of the VME Permit, CASI has presented new evidence that was not before Judge Mollway. The Court will therefore consider anew the specific terms of the VME permit.

## C. *Permissibility of the Two Percent ORMA Fee* ("Hula Kai")

11. The United States Constitution prohibits states from laying a "duty of tonnage" without the consent of Congress. U.S. Const. art. I, § 10, cl. 3 ("No State shall, without the Consent of Congress, lay any Duty of Tonnage").

12. A "duty of tonnage" is a charge upon a vessel as an instrument of commerce, for entering or leaving a port, or navigating the public waters of the country. *See Packet Co. v. Keokuk*, 95 U.S. 80, 84, 24 L.Ed. 377 (1877) ("To determine whether the charge prescribed by the ordinance in question is a duty of tonnage, within the meaning of the Constitution, it is necessary to observe carefully its object and essence.").

13. If the charge is clearly a duty, a tax, or burden, which in its essence is a contribution claimed for the privilege of entering the port of Keokuk, or remaining in it, or departing from it . . ., and measured by the capacity of the vessel, it is doubtless embraced by the constitutional prohibition of such a duty; *see also Huse v. Glover*, 119 U.S. 543, 549–50, 7 S.Ct. 313, 30 L.Ed. 487 (1886) (a duty of tonnage "is a charge upon a vessel, according to its tonnage, as an instrument of commerce, for entering or leaving a port, or navigating public waters"); *Indiana Port Comm'n v. Bethlehem Steel Corp.*, 653 F.Supp. 604, 609 (N.D.Ind.) ("Tonnage duties are taxes or tolls measured by tonnage and imposed on vessels that are instruments of commerce"), *aff'd*, 835 F.2d 1207 (1987) (affirming without reaching duty of tonnage issue).

14. The prohibition against tonnage duties "has been deemed to embrace all taxes and duties regardless of their name or form, and even though not measured by the tonnage of the vessel, which operate to impose a charge for the privilege of entering, trading in, or lying in a port." *Clyde Mallory Lines v. State of Ala.*, 296 U.S. 261, 265–66, 56 S.Ct. 194, 80 L.Ed. 215 (1935).

15. The prohibition against the imposition of duties of tonnage was designed "to guard against local hindrances to trade and carriage by vessels, not to relieve them from liability to claims for assistance rendered and fa[c]ilities furnished for trade and commerce." *Keokuk*, 95 U.S. at 84. Accordingly, reasonable fees charged by state authorities for services rendered to and enjoyed by the vessel are not "duties of tonnage." *Id.* at 84–85 ("[A] charge for services rendered or for conveniences provided is in no sense a tax or a duty. It is not a hindrance or impediment to free navigation."); *see also Barber v. Hawai'i*, 42 F.3d 1185, 1196 (9th Cir.1994) ("[A] state is not prohibited from charging reasonable fees in return for services rendered."); *Bethlehem Steel Corp.*, 653 F.Supp. at 610.

16. For example, a harbor fee charged for the use of restroom facilities, parking, trash disposal, and security is not a "duty of tonnage" because services are provided in exchange for the fee. *See Barber*, 42 F.3d at 1196. Similarly, if fees are for pilotage, wharfage, use of locks on a navigable river, or for medical inspection, those fees are not unconstitutional duties of tonnage. *See Clyde Mallory*, 296 U.S. at 266, 56 S.Ct. 194.

17. A fee charged to ensure that emergency services are available is also not a duty of tonnage, even if "not every ship paying the fee needs the service."

*New Orleans Steamship Ass'n v. Plaque-mines Port, Harbor & Terminal Dist.*, 874 F.2d 1018, 1023 (5th Cir.1989), *cert. denied*, 495 U.S. 932, 110 S.Ct. 2172, 109 L.Ed.2d 502 (1990).

18. The fee need not only be for direct services, but may also be for general services securing the benefits and protections of rules. Fees are not prohibited duties of tonnage when they are used for regulating the safety of vessels and facilitating the movement of vessels in a harbor. *See Clyde Mallory*, 296 U.S. at 264–67, 56 S.Ct. 194. Nor does a fee become a prohibited duty of tonnage just because the services provided by the fee are also used by persons not paying that fee. *See Barber*, 42 F.3d at 1196 ("Although the general public may occasionally use the services, the affiants use the services on a regular basis. . . . The fees are not a duty on tonnage.").

19. Based on this legal framework, the Court concludes that DO-BOR's assessment of a two percent (2%) ORMA Fee against the "Hula Kai" is an impermissible tax in violation of the prohibition against tonnage duties.[5]

20. In particular, the ORMA Fee fails because it does not relate to a specific service that confers a "readily perceptible" benefit to vessels operating in the Na Pali Coast ocean waters. *See Harmon v. City of Chicago*, 147 U.S. 396, 13 S.Ct. 306, 37 L.Ed. 216 (1893) (invalidating license fee similar to the ORMA Fee); *see also Clyde Mallory*, 296 U.S. at 264–67, 56 S.Ct. 194.

21. State Defendants argued the assessment of the ORMA Fee is justified in order to recover the costs of regulating the Na Pali Coast ocean waters. Specifically, State Defendants categorized the regulation costs into 1) costs for administering the pre-screening process, i.e., certifying that vessels are seaworthy and operators are competent; and 2) costs for enforcement of rules, i.e., policing waters. However, the Court concludes that no record was shown of regulatory activity in connection with the Na Pali Coast ocean waters nor was there any evidence of the costs associated with such regulatory activity.

22. While State Defendants argued that DOBOR conducts "spot checks" of the Na Pali Coast ocean waters on an irregular basis, no evidence was presented to substantiate that contention. The State Defendants relied solely on Defendant Tyndzik's testimony that he has from time to time personally participated in such spot checks as evidence of a regulatory scheme. Defendant Tyndzik's testimony alone, however, is insufficient to demonstrate the existence of such a scheme.[6]

23. The record is bereft of any evidence corroborating the existence of any regulatory scheme specific to the Na Pali Coast ocean waters. State Defendants have presented no documented records of "spot checks," patrols, or other regulatory

5. State Defendants attempt to argue the inapplicability of the duty of tonnage prohibition based on the fact that the "Hula Kai" is not engaged in interstate commerce. However, the prohibition against duties of tonnage extends to all vessels engaged in the coastwise trade under federal licenses, "whether employed in commercial intercourse between ports in different States or between different ports in the same State." *State Tonnage Tax Case v. Collector Trade Co.*, 12 Wall. 204, 79 U.S. 204, 219, 20 L.Ed. 370 (1870).

6. Moreover, the Court finds Defendant Tyndzik's description of his activities on these "spot checks," by his own admission, to be more in the nature of "orientations" rather than "regulatory" efforts. Defendant Tyndzik testified that he "[doesn't] do enforcement," rather, his activities involve orienting himself with the area and types of operations in the area, and checking the traffic separation scheme, as well as the overlap of recreational issues over commercial issues.

efforts including activities taken to ensure the safety of vessels or the conservation and/or preservation of those waters. Indeed, there has been no tangible evidence presented indicating that DOBOR has expended any regulatory efforts specific to the Na Pali Coast area.

24. Even assuming that some record of regulatory and/or preservation activity in connection with the Na Pali Coast ocean waters can be established, there is no evidence that the ORMA Fees collected are used to defray its cost.

25. Moreover, there is a complete absence of accounting for any costs specifically allocable to the Na Pali Coast ocean waters, including those alleged to relate specifically to regulating and/or preserving those waters.

26. The ORMA Fee appears, therefore, to be a revenue measure that is used to recoup the costs of a statewide boating program whose many components are not limited to commercial navigation within the Na Pali Coast ocean waters.

27. DOBOR's deposit of all revenues into an aggregate fund, coupled with the absence of any allocations specifically attributable to the Na Pali Coast ocean waters, leaves this Court unable to conclude that ORMA Fees collected by DOBOR are actually being used for the asserted purpose of regulating and/or preserving those waters.

28. In sum, the evidence and testimony presented in this case fails to support State Defendants' claim as to the benefits and services they attribute to the state's regulation of the Na Pali Coast ocean waters.[7]

29. Based on the overwhelming evidence, the Court finds DOBOR's assessment of a two percent (2%) ORMA Fee against the "Hula Kai" to be an impermissible tax in violation of the prohibition against tonnage duties.[8]

### D. Permissibility of the Two Percent (2%) Use Fee ("SPIRIT OF KAUAI")

30. With regard to the two percent (2%) use fee DOBOR assesses CASI on the gross receipts of "Spirit of Kauai," however, the Court does not find the fee to be an impermissible tax under either the duty of tonnage prohibitions[9] or the Fourteenth Amendment Due Process clause.

31. With regard to the duty of tonnage prohibition, the record clearly establishes that the fee is charged in return for a service rendered—the provision of harbor maintenance and improvement.

32. "Spirit of Kauai" has unfettered access to Kukuiula SBH, including among

---

7. Additionally, while pre-screening activities conducted by the State may indeed provide a benefit to CASI, in that the seaworthiness of vessels and the competency of operators are ensured, State Defendants have not shown the required nexus between the ORMA Fee charged and the benefit provided. As discussed *supra*, State Defendants have failed to show that the ORMA Fees collected defray the costs of regulating the Na Pali Coast ocean waters, and not the general costs of statewide boating activities as a whole.

8. Because the Court finds the ORMA Fee to be an impermissible tax, it need not reach the issue of reasonableness.

9. The Court again rejects State Defendants' argument that the duty of tonnage prohibition is inapplicable based on the fact that *Spirit of Kauai* is not engaged in interstate commerce. *See State Tonnage Tax Case v. Collector Trade Co.*, 12 Wall. 204, 79 U.S. 204, 219, 20 L.Ed. 370 (1870) (finding that prohibition against duties of tonnage extends to all vessels engaged in the coastwise trade under federal licenses, "whether employed in commercial intercourse between ports in different States or between different ports in the same State").

other things, use of the facilities, parking, and security, as well as any improvements made thereon.[10] State Defendants presented evidence sufficiently demonstrating that the Kukuiula SBH facility has various improvements, such as breakwater, parking, lights, etc.; moreover, these improvements are maintained by DOBOR regardless of how often the pier is used by CASI. Maintenance and/or improvement of the harbor continues irrespective of whether CASI chooses to use it.

33. State Defendants have sufficiently established, therefore, that the two percent (2%) use fee is a permissible charge for the facilities and amenities provided by DOBOR at Kukuiula SBH. *See Clyde Mallory*, 296 U.S. at 264–67, 56 S.Ct. 194; *see also Barber*, 42 F.3d at 1196.

34. CASI points out that the revenues for Kukuiula SBH vastly exceed the expenses for it, e.g., that the 1999 tallies for the Kukuiula SBH showed revenues of $40,344 (not including the liquid fuel tax) and expense of only $4,324.

35. The testimony at trial, however, was that the expense records for the individual harbors fail to capture all costs reasonably attributable to each harbor. Specifically, the expense records do not account for the services provided by the central office in Honolulu in support of these harbors. Shared expenses, for example, such as for accounting, legal, management and other support services, were not reflected in the expense reported for Kukuiula SBH, but that facility generally

benefitted from these services and should be assessed its share of such expenses.

36. Further, there is no requirement that the fee charged in return for the services rendered be an exact dollar for dollar scheme.

37. The Court thus concludes that the two percent (2%) use fee assessed the "Spirit of Kauai" is not a prohibited duty of tonnage.

38. With respect to CASI's Due Process claim, this Court concludes as a matter of law that the State's imposition of the two percent (2%) fee does not violate CASI's right to substantive due process.

39. Specifically, CASI has failed to show that the two percent (2%) fee is so arbitrary or unreasonable that it does not bear a rational relationship to the regulation of DNLR facilities.

40. As Judge Mollway indicated in a previous ruling, "[t]o demonstrate a substantive Due Process violation, a plaintiff is ordinarily required to prove that a challenged government action was clearly arbitrary and unreasonable, having no substantial relation to public health, safety, morals, or general welfare." 2001 Order at 14 (citing *Patel v. Penman*, 103 F.3d 868, 874 (9th Cir.1996), *cert. denied*, 520 U.S. 1240, 117 S.Ct. 1845, 137 L.Ed.2d 1048 (1997)).

41. The Ninth Circuit made clear in *Del Monte Dunes v. City of Monterey*, 920 F.2d 1496, 1508 (9th Cir.1990), that the

10. Moreover, as Mr. Evans conceded at trial, VME permit holders can operate as though they have a commercial operator's permit, without actually being issued one. Apparently, VME permit holders are able to continue operations from a slip and not necessarily from a Vessel Moored Elsewhere, without actually obtaining a commercial operator's permit. Accordingly, despite a waiting list for commercial operator permits at Kukuiula

SBH, CASI, by virtue of its status as a VME permit holder, effectively "jumps" those on that list. Thus, as long as CASI retains its VME permit for the "Spirit of Kauai", it precludes the issuance of additional commercial permits. CASI clearly derives, therefore, a benefit, as well as a competitive advantage, from DOBOR's regulation and/or maintenance of harbor access.

challenger's burden to show that a statute is arbitrary and irrational is extremely high.

42. CASI argues that it is arbitrary to burden "Spirit of Kauai" with the same two percent (2%) fee it would be required to pay had the vessel's VME Permit been renewed. Economic regulation challenged under the Due Process Clause is subject to rational basis review. *See National Educ. Assoc. v. Retirement Bd. of the Rhode Island Employees' Ret. Sys.*, 172 F.3d 22, 30–31 (1st Cir.1999) (citing *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)).

43. Therefore, this Court must consider whether the two percent (2%) fee violates CASI's right to substantive due process on the grounds that there is no rational basis for subjecting commercial permit holders to the two percent (2%) use fee.

44. CASI presented evidence at trial demonstrating that it has not received any services nor used the DNLR's facilities and amenities at Port Allen SBH while operating "Spirit of Kauai" from the DOT Commercial Pier. Accordingly, CASI argues, the fee charged is arbitrary and unreasonable, and not rationally related to regulating the same DOT piers.

45. Substantive due process in the context of economic regulation does not, however, mandate the most rational or efficient method of achieving a goal, only a rational one. *See National Educ.*, 172 F.3d at 31; *see also Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984).

46. In this case, State Defendants have determined that the commercial operators should bear an increased burden with respect to the regulation, maintenance and improvement of DNLR facilities.

47. State Defendants have presented sufficient evidence establishing that fees assessed are used towards maintaining, managing, repairing and improving Kukuiula SBH. CASI clearly uses and/or has access to the use of Kukuiula SBH; a charge for this privilege is not arbitrary.

48. This Court cannot say, therefore, that the two percent (2%) fee charged is so arbitrary, capricious, or unreasonable that it does not bear a rational relationship to the regulation of these DNLR facilities. Accordingly, the two percent (2%) use fee does not violate CASI's right to substantive due process.

**E. *Improper Termination of VME Permit***

49. The Fourteenth Amendment protects citizens from deprivations of life, liberty, or property without due process of law. *See* U.S. Const. amend. XIV, 1.

50. Procedural due process ensures that a state will not deprive a person of life, liberty, or property unless fair procedures are used in making that decision. *See Archuleta v. Colorado Dep't of Insts., Div. of Youth Servs.*, 936 F.2d 483, 490 (10th Cir.1991); *see also Maricopa–Stanfield Irrigation & Drainage Dist. v. United States*, 158 F.3d 428, 435 (9th Cir.1998).

51. To determine whether a plaintiff was denied procedural due process, the courts engage in a two-step inquiry: 1) did the individual possess a protected interest to which due process protection is applicable, and 2) was the individual afforded an appropriate level of process. *See Foss v. National Marine Fisheries Serv.*, 161 F.3d 584, 588 (9th Cir.1998); *see also Watson v. University of Utah Med. Ctr.*, 75 F.3d 569, 577 (10th Cir.1996).

52. The evidence presented at trial, as well as Judge Mollway's ruling in the 2001 Order, demonstrates that CASI

has a legitimate claim of entitlement to renewal of an annual VME permit. CASI has clearly established a protected property interest, and thus, a right to expect renewal of the same. Accordingly, the Court's analysis is constrained to a determination of whether the State failed to provide what CASI was entitled to in violation of CASI's Due Process rights.

53. Having created a permit structure for commercial vessels, having issued and reissued such permits in the past, and having promised CASI renewal in this instance, DOBOR violated the Due Process Clause of the Fourteenth Amendment by summarily withholding the promised VME Permit for reasons that were undisclosed or tested through a fair administrative hearing process

54. DOBOR's refusal to renew the VME Permit without affording CASI an opportunity to contest the reasons for the refusal deprived CASI of a constitutionally protected property interest in violation of the Due Process Clause of the Fourteenth Amendment.

55. The Court also concludes that CASI did not reject the promised VME Permit because none was offered. Nor did CASI waive its property interest in a renewed VME Permit by requesting the opportunity to review the proposed addendum with counsel.

56. CASI did not intend to waive its right to this benefit, and the Court is unwilling to imply waiver based on the events of June 4, 1999.

57. Because the operating rights embodied in the VME Permit are protected by the Fourteenth Amendment, State Defendants may not eviscerate them through operating restrictions imposed summarily and without opportunity for hearing.

58. Having considered the totality of the circumstances, including the demands on and the use of the Port Allen SBH as a whole, the Court finds the conditions and/or prohibitions contained in the addendum to be unduly burdensome, and concludes that their summary imposition would operate to deny CASI due process of law.

59. Because the withholding of the VME Permit has caused and will continue to cause harm for which there is no adequate remedy at law, CASI is entitled to an injunction enjoining the State Defendants, and their subordinates and those acting in concert with them, from withholding renewal of the VME Permit free of the restrictions and limitations contained in the proposed addendum.

## ORDER

AND NOW, following the conclusion of a bench trial in this matter, and in accordance with the foregoing Findings of Fact and Conclusions of Law, it is HEREBY ORDERED that judgment shall enter: (1) in favor of CASI and against State Defendants on Counts 2 and 5 of CASI's Second Amended Complaint, filed on October 19, 2000; and (2) in favor of State Defendants and against CASI, on Counts 1 and 3 of CASI's Second Amended Complaint, filed on October 19, 2000.

IT IS SO ORDERED.